**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

*UNITED STATES OF AMERICA,*

-v-

LOUIS ANTHONY MANNA,

**Defendant.**

**Case No.: 88-CR-239**

### DEFENDANT LOUIS ANTHONY MANNA EMERGENCY
### MOTION TO REDUCE SENTENCE PURSUANT TO
### 18 U.S.C. § 3582(c)(1)(A)(i)

Louis Anthony Manna ("Mr. Manna"), by and through his counsel, respectfully moves pursuant to 18 USC 3582(c)(1)(A)(i) for an order reducing his sentence of imprisonment to time-served based on "extraordinary and compelling reasons" as discussed below.

Mr. Manna's rapidly declining health requires immediate care, which the BOP is not equipped to treat. To date, Manna's treatment has been "severely lacking." As fully detailed in Dr. John McGee's affidavit, Manna requires "expedited management" as there has been a "woeful lack of care [] provided to Mr. Manna," as it pertains to most of his health conditions, including but not limited to uncontrolled his hypertension and extreme risk for stroke; dysphaia; colitis with fecal incontinence; recurrent MRSA cellulitis with high risk of MRSA sepsis; and untreated Parkinson's disease.  Additionally, Dr. McGee opines, based on his analysis of Manna's medical condition, and current living environment,  Manna is highly susceptibility to COVID-19 and if contracted would be at great risk of death. (**Exhibit A** – Affidavit of Dr. McGeee).

1

In sum, Manna's poor health conditions coupled with his advanced age make him uniquely vulnerable to COVID-19[1]. The virus has already infiltrated numerous jails and prisons (including FMC Rochester) and courts in this District and Circuit, as well as authorities across the country, have begun to release inmates who are at high risk of being infected with COVID-19 like Mr. Manna[2].

Manna falls squarely within the group of individuals who are at high risk of losing the battle to COVID-19 if contracted. The CDC has stated that "[a]s you get older, your risk of being hospitalized for COVID-19 increases. Everyone, especially older adults and other at increased risks of severe illness, should take steps to protect themselves from getting COVID-19.[3]" As the chart herein clearly depicts, individuals of 85 years and older are the most susceptible to the deadly virus.

---

[1] Manna diagnosis places him at high risk of contracting COVID-19
[2] As of August 28, 2020 there have been 13 Confirmed Cases of COVID-19
[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

2



In addition to Manna's susceptibility to COVID-19, Manna also qualifies for release pursuant to §3582(c) also commonly referred to as the safety valve provision. Such, the totality of Manna's circumstances should be considered, when this Court determines whether Manna's sentence should be reduced.

In sum, Manna's age coupled with his well-documented medical conditions, of which two are among the enumerated medical conditions which place Manna at an increased risk, if he is to contract the deadly virus: cancer and heart disease. That said, correctional settings increase the risk of contracting an infectious disease, like COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others. Correctional facilities house large groups of inmates together, and move inmates in groups to eat, do recreation, and go to court. They frequently have insufficient

medical care for the population, and in times of crisis, even those medical staff cease coming to the facility. Hot water, soap and paper towels are frequently in limited supply. Inmates, rather than professional cleaners, are responsible for cleaning the facilities and often not given appropriate supplies. This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible. Based on the aforesaid information, if Manna is to contract the virus, it is more than likely that he would not survive.

### THE WARDEN BELIEVES MANNA SHOULD BE RELASED

Notably, the Warden does not dispute that Mr. Manna is eligible for release pursuant to the First Step Act ("FSA"). Moreover, Counsel contends that even absent the imminent threat of COVID-19, 18 U.S.C. 3582 enumerates several provisions of which Manna is eligible for release under. On November 14, 2019, Manna's request for release was reviewed by the BOP, of which it was stated that he was eligible for release pursuant to the FSA and his likelihood of recidivism was "low." (**Exhibit B** - Evaluation). Thereafter, FMC Rochester Warden, in his letter of April 20, 2020, recommended Manna's release pursuant to the aforesaid statute.

### GENERAL COUNSEL WRONGFUL DENIAL

Manna's release was denied at the second layer of approval, by General Counsel, as it was determined that Mr. Manna did not fit the criteria laid out in Section 3b and 4b of PS 5050.50. (**Exhibit C** – Denial from General Counsel).  Although, the undersigned disputes general counsel's findings on the September 1, 2020 letter, it is undisputed that General Counsel has failed to evaluate Manna's release under 4(a) entitled "New Law" Elderly Inmates which grants

4

a compassionate release to inmates who were sentenced to an offence that occurred on or after November 1, 1987 (e.g. "new law") who are 70 years or older and have served 30 years or more of their imprisonment.

Here, it is clear that Mr. Manna squarely fits within the defined definition of the individuals whom this court must grant relief to, thus Manna requests that this Court grant his release.

### APPEAL GENERAL COUNSEL'S ERRONOUS DESCSION
### TO THE DISTRICT COURT

The newly enacted provisions set forth in the FSA allows Manna to appeal said decision to the sentencing district court. Thus, Manna seeks your honors unbiased review of the extraordinary and compelling circumstances which warrant release, and respectfully ask that this court honor the opinion of the individual best situated to determine whether Manna fits within the criteria of 18 U.S.C. 3582, the Warden of FMC Rochester.

As such, Mr. Manna moves the Court for an order, and a hearing if necessary, reducing his sentence to time served due to Mr. Manna's debilitating health conditions coupled with his old-age of 90 years old; entitles Manna's release from custody after 30 years. (18 U.S.C. § 3582(c)(1)(A)(i)). Currently, Mr. Manna is under the custody of the Federal Bureau of Prisons (BOP) and incarcerated at the Federal Medical Center of Rochester, 2110 East Center Street, Rochester, MN 55904 (FMC Rochester). According to the BOP website the expected release date of Mr. Manna's is November 7, 2054. As of the date of this motion, Mr. Manna has been

incarcerated under the custody of the BOP for more than 30 years[4]. In light of Mr. Manna's current health conditions coupled with his age and time incarcerated he is a candidate for release pursuant to 18 U.S.C. 3582, and the newly enacted provision stating in that those sentenced for an offense that occurred after November 1, 1987, who are 70 years old or older; and have served 30 years of the sentence, are eligible for relief.

If the Court schedules a hearing, the undersigned counsel will waive Mr. Manna's presence for judicial efficiency and to protect the safety of everyone involved, due to the current COVID-19 pandemic.

Accordingly, in keeping with the spirit of the FSA – and in light of the unprecedented moment and the fact that a significant portion of Mr. Manna's sentence has already been served – we urge the Court to grant Mr. Manna's compassionate release and allow him to return home for his remaining days.

## I.   FACTUAL BACKGROUND

Mr. Manna is 90 years old and has been incarcerated for more than 30 years, when he was convicted of various crimes, pursuant to both "new" and "old law." (Exhibit D – Criminal Judgment). Despite the passage of time, Mr. Manna still maintains strong familiar ties, as his adult son and his wife have agreed to house Mr. Manna when released, from BOP custody. Specifically, his son's New Jersey residence has already been approved by the

---

[4]Louis Manna was found guilty on June 27, 1989

United States District Court of New Jersey's Office of Probation, as there was a site visit by Officer Joseph Empirio on August 14, 2020.

Specifically, Mr. Manna's family have agreed to care for the health and well-being of Mr. Manna in his late years. Moreover, it must be noted that due to Mr. Manna's physical health, he no longer poses any danger to society.  Most importantly, on November 4, 2019, the BOP conducted an evaluation, finding that Manna was in fact Eligible for release under the FSA and that he was a "low" risk of recidivism. (Exhibit B – Review).

## II.    ARGUMENT
## MR. MANNA'S COMPASSIONATE RELEASE REQUEST TO THE BOP

Mr. Manna submitted a request for compassionate release, pursuant to 18 U.S.C. § 3582(c) and 28 C.F.R. § 571.61. to the Warden of FMC Rochester. ((18 U.S.C. § 3582(d)(2)(B)(ii), (iii); 28 C.F.R. § 571.61(b). Thereafter, on April 20, 2020, Mr. Manna was apprised that the Warden had approved his request for release.  Then, Probation was sent for a site inspection of Mr. Nardone's house, which was then approved. But the request was denied when it was reviewed by General Counsel.  As stated supra, and as glens from the exhibits attached hereto, Manna fits squarely within the New Law, Elderly Inmates (section 4(a)). General Counsel's denial clearly fails to enumerate an analysis pursuant to section 4(a), and it is the position of the undersigned that Manna would have been released, if said analysis was completed.

Moreover, Manna avers that even under the analysis performed by General Counsel, and portrayed in the September 1st 2020 denial letter, Manna is in fact "debilitated" as he cannot perform his day to day hygiene tasks, and needs assistance as would any other 90 year old. Under

the circumstances present in this case, time is of the essence as Mr. Manna is of frail age and in poor medical health and is in need of day to day medical care and assistance.

**I. THIS COURT HAS AUTHORITY TO RESENTENCE MANNA UNDER SECTION 3582(C)(1)(A)(i) FOR THE EXTRAORDINARY AND COMPELLING REASONS PRESENTED HERE.**

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners to time served under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons," and the reasons that can justify resentencing include but are not limited to an inmates medical, elderly age, or family circumstances.   Therefore, in addition to Manna's plea for relief due to his age, medical conditions as well as the instant COVID-19 pandemic; Manna also seeks relief as he believes the change in law, only seven months prior to his sentencing would have afforded him the opportunity for parole. Such parallel changes in law have been previously held extraordinary and compelling reasons to reduce sentences.

*A. When Congress originally enacted § 3582 in 1984, it intended for district courts to reduce sentences for prisoners on the basis of extraordinary and compelling reasons not limited to medical, family, or elderly circumstances.*

Congress first enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence if and whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. §

3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director filing an initial motion in the sentencing court; absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons. *Id.*

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c). But the legislative history gives an indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 52, 53 n.74 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which **other extraordinary and compelling circumstances justify a reduction of an unusually long sentence**, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment. *Id.* at 55–56 (emphasis added). Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," *id.* at 121, that enabled sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system.

9

This particular safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly *compelling situations.*" *Id.* (emphasis added).

Congress thus intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences. And there is no indication that Congress limited the safety valve of § 3582(c)(1)(A) to medical or elderly release; if extraordinary and compelling circumstances were present, they could be used to "justify a reduction of an unusually long sentence." S. Rep No. 98-225, at 55–56.

**B. The U.S. Sentencing Commission concluded that § 3582(c)(1)(A)'s "extraordinary and compelling reasons" for compassionate release are not limited to medical, elderly, or family circumstances.**

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Congress provided only one limitation to that delegation of authority: "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added). Congress no doubt limited the ability of rehabilitation *alone* to constitute extraordinary circumstances so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling

10

reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier "alone" signifies just the opposite: that rehabilitation could be used in tandem with other factors to justify a reduction.

The Commission initially neglected its duty, leaving the BOP to fill the void and create the standards for extraordinary and compelling reasons warranting resentencing under § 3582(c)(1)(A). The Commission finally acted in 2007, promulgating a policy that extraordinary and compelling reasons includes medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, application note 1(A). After a negative DOJ Inspector General report found that the BOP had rarely moved courts for a § 3582(c)(1)(A) modification even for prisoners who met the objective criteria, see U.S. Dep't of Justice Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013) ("FBOP Compassionate Release Program"), the Commission amended its policy statement, expanding the guidance to courts on qualifying conditions and admonishing the BOP to file motions for compassionate release whenever a prisoner was found to meet the objective criteria in U.S.S.G. § 1B1.13. *Id.* at application note 4; see also *United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).

The Commission created several categories of qualifying reasons: (A) "Medical Conditions of the Defendant," including terminal illness and other serious conditions and impairments; (B) "Age of the Defendant," for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) "Family Circumstances," where a child's caregiver or spouse dies or becomes incapacitated

11

without an alternative caregiver; and (D) "Other Reasons," when the Director of the BOP determines there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*, application note 1(A). The Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, application note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

Consistent with the text and legislative history of § 3582(c), the Commission concluded that reasons beyond medical, age, and family circumstances could qualify as "extraordinary or compelling reasons" for resentencing, and that the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant.

**Change in law has caused an "extraordinary and compelling" reasons for review and release of the aging Manna.**

Mr. Manna was indicted in June of 1988. This date is critically important, because it determined that Mr. Manna was to be sentenced in accordance with the Sentencing Reform Act of 1984 (SRA) under the United States Sentencing Guidelines. Notably, the SRA abolished federal parole for individuals whose offenses were committed after November 1, 1987. As a result, Mr. Manna missed being parole eligible by just 7 months. The implications of this small margin are drastic. Had he been parole-eligible, Mr. Manna would likely have been up for parole consideration on at least 3 occasions by now. Further, given the nearly 3 decades he has spent in

federal custody, his model inmate status, and his failing health, there is a very real possibility that had he been parole-eligible, Mr. Manna would have already been released. Instead, as his sentence currently stands, Mr. Manna will most certainly die in custody in the near future. These distinct realities, separated by a mere 7 months, are particularly concerning in light of the underlying purpose of the SRA and the Guidelines of promoting consistency and avoiding disparities amongst similarly situated defendants. The BOP has the power to correct this clearly unintended injustice.

Legislative history gives an indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 52, 53 n.74 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing: The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment. *Id.* at 55–56 (emphasis added). Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

13

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," *Id.* at 121, that enabled sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. This particular safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." *Id.* (emphasis added). Congress thus intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences.

**C. Through the First Step Act, Congress changed the process for compassionate release based on criticism of BOP's inadequate use of its authority, returning to the federal judiciary the authority to act on its own to reduce sentences for "extraordinary and compelling reasons."**

Prior to Congress passing the First Step Act, the process for compassionate release under § 3582(c)(1)(A) was as follows: the U.S. Sentencing Commission set the criteria for resentencing relief under § 3582(c), and the only way a sentencing court could reduce a sentence was if the BOP Director initiated and filed a motion in the sentencing court. See PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984). If such a motion was filed, the sentencing court could then decide where "the reduction was justified by 'extraordinary and compelling reasons' and was consistent with applicable policy statements issued by the Sentencing Commission." *Id.* So even if a federal prisoner qualified under the Commission's definition of extraordinary and compelling reasons, without the BOP Director's filing a motion, the sentencing court had no authority to reduce the sentence, and the prisoner was unable to secure a sentence reduction. This

14

process meant that, practically, the BOP Director both initiated the process and set the criteria for whatever federal prisoner's circumstances the Director decided to move upon.[5]

Leaving the BOP Director with ultimate authority for triggering and setting the criteria for sentence reductions under § 3582(c)(1)(A) created several problems. The Office of the Inspector General found that the BOP failed: to provide adequate guidance to staff on the criteria for compassionate release, to set time lines for reviewing compassionate release requests, to create formal procedures for informing prisoners about compassionate release, and to generate a system for tracking compassionate release requests. See *FBOP Compassionate Release Program*, at i–iv. As a result of these problems, the OIG concluded that "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." *Id.*; see generally Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 FED. SENT. RPTR. 167 (Feb. 2009).

---

[5] The Department of Justice has recognized that, prior to the passage of the First Step Act, BOP (and not the Commission) functionally had final say on what constituted an "extraordinary and compelling reason" for a sentence reduction, because only BOP could bring a motion under the terms of § 3582(c)(1)(A). See Dep't of Justice, Letter to U.S. Sentencing Commission Chairman Hinojosa (July 14, 2007) (noting that because Congress gave BOP the power to control which particular cases will be brought to a court's attention, "it would be senseless [for the Commission] to issue policy statements allowing the court to grant such motions on a broader basis than the responsible agency will seek them").

Congress heard those complaints. In late 2018, Congress passed the First Step Act, part of which transformed the process for compassionate release under § 3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and then move for release, a court can now resentence "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies, "or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Once the defendant who has properly exhausted files a motion, a court may, after considering the 18 U.S.C. § 3553(a) factors, resentence a defendant, if the court finds that extraordinary and compelling reasons warrant a reduction. *Id.* Any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The effect of these new changes is to allow federal judges the ability to move on a prisoner's compassionate release application even in the face of BOP opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner.

Congress made these changes in an effort to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A). Congress labeled these changes, "*Increasing* the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018) (emphasis added). Senator Cardin noted in the record that the First Step Act made several reforms to the federal prison system, including that "[t]he bill *expands compassionate release* under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199, at S7774 (Dec. 18, 2018) (emphasis added). In the House, Representative Nadler noted that

16

First Step included "a number of very positive changes, such as . . . *improving application of compassionate release*, and providing other measures to improve the welfare of Federal inmates."164 Cong. Rec. H10346-04, 164 Cong. Rec. H10346-04, H10362 (Dec. 20, 2018) (emphasis added).

Federal judges now have the power to order reductions of sentences even in the face of BOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress intended the judiciary not only to take on the role that BOP once held under the pre- First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the applicable statute.

Here, Manna argues that the Warden, not General Counsel, is in the best position to act on behalf of BOP, as the Warden is the best situated to truly determine Manna's needs; unlike General Counsel who depends on paper. Now we respectfully turn to this Court, for its determination, seeking confirmation that Warden Kallis was correct in his initial findings, that Manna was in fact eligible and should be released, pursuant to certain provisions of §3582.

**D. Statutory text defines judicial sentence reduction authority around "extraordinary and compelling reasons," and the policy statements of the U.S. Sentencing Commission under § 1B1.13 do not preclude this Court from resentencing Manna.**

Once a prisoner has properly pursued administrative remedies and filed a motion for compassionate release, a federal court possesses authority to reduce a sentence if and whenever the court finds "extraordinary and compelling reasons warrant such a reduction." A court must

consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction

of a sentence that a court orders must also be "consistent with applicable policy statements issued

by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

As noted above, the Sentencing Commission created a catch-all provision for compassionate

release under U.S.S.G. § 1B1.13, application note (1)(D), which states:

> Other Reasons.—As determined by the Director of the Bureau of
> Prisons, there exists in the defendant's case an extraordinary and
> compelling reason other than, or in combination with, the reasons
> described in subdivisions (A) through (C).

The Commission also stated the process by which compassionate release reductions should be

decided:

> Motion by the Director of the Bureau of Prisons.—A reduction
> under this policy statement may be granted only upon motion by
> the Director of the Bureau of Prisons pursuant to 18 U.S.C. §
> 3582(c)(1)(A).U.S.S.G. § 1B1.13, application note 4. The
> dependence on BOP in these policy statements is a relic of the prior
> procedure that is now inconsistent with the First Step Act's
> amendment of § 3582(c)(1)(A). Application note 1(D) can no
> longer limit judicial authority to cases with an initial determination
> by the BOP Director that a prisoner's case presents extraordinary
> or compelling reasons for a reduction, because the First Step Act
> has expressed allows courts to consider and grant sentence
> reductions even in the face of an adverse or unresolved BOP
> determination concerning whether a prisoner's case is
> extraordinary or compelling. See 18 U.S.C. § 3582(c)(1)(A), as
> amended by P.L. 115-391 § 503 (Dec. 21, 2018). And the
> Commission's now-dated statement indicating that the BOP must
> file a motion in order for a court to consider a compassionate
> release sentence reduction no longer controls in the face of the new
> statutory text enacted explicitly to allow a court to consider a
> reduction even in the absence of a BOP motion. Id. With the First
> Step Act, Congress decided that federal judges are no longer
> constrained or controlled by how the BOP Director sets its criteria
> for what constitutes extraordinary and compelling reasons for a
> sentence reduction.

Consequently, those sections of the application notes requiring a BOP determination or motion are not binding on courts. See *Stinson v. United States*, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."). Put differently, now that the First Step Act has recast the procedural requirements for a sentence reduction, even if a court finds there exists an extraordinary and compelling reason for a sentence reduction without the BOP Director's initial determination, then the sentence reduction is not inconsistent "with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

## IV. MANNA HAS EXTRAORDINARY AND COMPELLING REASONS WHY HIS SENTENCE SHOULD BE REDUCED.

Manna has properly exhausted his claim for a reduction of sentence under the compassionate release provision, and he presents this Court with extraordinary and compelling reasons for reducing his sentence. Which includes, but is not limited to the fact that Mr. Manna meets the criteria for release as well as the fact that if the law did not change, Manna would have been sentenced pursuant to the old law, entitling him to parole.

**A. Manna has extraordinary and compelling reasons justifying a sentence reduction.**

Manna's current sentence presents "extraordinary and compelling reasons" for a sentence reduction as fully explained herein. Specifically, Manna's motion must be granted as Manna falls within multiple enumerated classes defined by the FSA. Additionally, Manna has proffered

demonstrative evidence that there are extraordinary and compelling reasons outside Manna's health warranting a sentence reduction: COVID-19 and Manna's ineligibility of Parole due to the change in law.

> ### i. Inmate Louis Manna Satisfies all Criteria Set forth in Program Statement 5050.4(a) entitled "New Law" Elderly Inmates, the provision not analyzed by General Counsel.

### 2. The Inmate is age 70 or Older

Louis Anthony Manna was born on December 2, 1929. Today, he is months' shy of his 91st birthday. Accordingly, Mr. Manna easily satisfies this first point, as he is 20 years older than the minimum age for consideration under this section.

### 3. The Inmate has Served 30 Years or More of his Term of Imprisonment

Mr. Manna is serving an 80-year term of imprisonment. To date, he has served 32 years in custody, and has earned about five years of good time credit during that period. Accordingly, when factoring in good time credit earned, Mr. Manna's 32 years served more accurately approximates to 37 years served, placing the amount of time Mr. Manna has served to-date 7 years beyond the minimum term required under this section.

### 4. Manna was Sentenced for an alleged crime on or After November 1, 1987

Manna was sentenced for crimes, which occurred after the aforesaid date; specifically, counts 7, Conspiracy to violate Taft Harley Act and Count 26 illegal gambling, which allegedly occurred until the time of his arrest on or about June 23, 1988. As such, it is clear that Manna's meets the criteria set forth herein.

Based on the aforesaid, it is clear that Manna clearly satisfies the requirements set forth in 4(a).

*ii. Inmate Louis Manna Satisfies all Criteria Set forth in Program Statement 5050.4(b) entitled "Elderly inmates with Medical Conditions."*

### 1. The Inmate is Age 65 or Older

As previously discussed, Mr. Manna is nearly 91 years old. Accordingly, the first factor set forth in the Program Statement is clearly satisfied by a margin of more than 25 years.

### 2. The Inmate Suffers from Numerous Chronic and/or Serious Medical Conditions Related to the Aging Process

Mr. Manna suffers from numerous chronic medical conditions. Since 2003, Mr. Manna has suffered from nerve damage in his right leg. The damage has resulted in Mr. Manna's inability to control his right foot; a condition commonly referred to as drop foot. While this might seem harmless at first glance, it poses an ever-present risk of falling, and for a 90-year-old like Mr. Manna the reality is that a serious fall could be devastating, or worse, life threatening; that said previous falls have already caused Manna to incur head injuries and fractures. In addition to foot drop, Mr. Manna is required to wear surgical socks at the expense of the BOP in order to prevent the development of an embolism. Beyond these conditions, Mr. Manna suffers from a number of other serious physical medical ailments including long-term chronic skin issues, prostate cancer, and colon cancer.

Mr. Manna's chronic skin issues started in 2011 and have only worsened over the years. He has been treated for eczema, ringworm, and even Methicillin-Resistant Staphylococcus Aureus (MRSA), a condition that has resulted in several abscesses that have required draining

21

and monitoring, and that is known to be dangerous- especially to someone of Mr. Manna's advanced age and declining physical condition. During serious bouts of skin problems, Mr. Manna was seeing doctors at BOP medical facilities at least once a month for months at a time. This is demonstrated by the chronology derived from BOP medical records that we have received and reviewed. The seriousness of his skin problems cannot be overstated. Mr. Manna's medical records were provided to Dr. John R. McGee for his review and analysis.

In his letter Dr. McGee states:

> With his increasing frequency of MRSA skin infections in an environment where his risk of another infection or more, there is a high probability that Mr. Manna will develop a deadly case of MRSA sepsis. In that MRSA sepsis carries more than a 50% mortality rate in immuno-compromised patients such as Mr. Manna, it is very likely that he will die from an episode of MRSA bacteremia in the next year.

Beyond this devastating analysis, the seriousness of Mr. Manna's skin condition can be further demonstrated by the extensive list of medications administered to him in an effort to combat these issues. [As a collateral consideration, these medications in conjunction with the other medications Mr. Manna is prescribed for conditions such as high blood pressure, and stomach issues, are most likely very costly for the BOP.]

Perhaps just as disconcerting as the risks associated with Mr. Manna's chronic skin issues are his prostate and colon cancer diagnoses, particularly in light of his age and family history. With regard to Mr. Manna's dual cancer diagnosis he underwent 50 rounds of chemotherapy for over a year starting in May 1995, continuing all the way through July 1996. During his fight with cancer, Mr. Manna was also required to undergo 2 major surgeries removing portions of his colon. Although Mr. Manna is currently in remission, there is always a fear that the cancer will return. There is a long and extensive history of colon cancer in his

family. Mr. Manna's father died at the age of 55 from colon cancer, his sister died at the age of 60 from colon cancer, another sister was diagnosed with colon cancer at the age of 64. It should come as little surprise that due to the widespread history of colon cancer in his family, Mr. Manna is concerned about the possibility of recurrence. In 2008, Mr. Manna became very distressed when a colonoscopy could not be scheduled within a reasonable time frame to monitor any developments. Mr. Manna is in constant fear that his colon cancer will return, and will be diagnosed too late for him to receive the proper treatment due to the limited resources within the BOP with regard to specialized medical treatment and exploratory/preventive procedures. As recently as October 5, 2016, Mr. Manna was seen at an outside hospital for a consultation regarding his colonoscopy results, which indicate findings of an adenoma in the area of his pancreas. This is of great concern given his history, as well as his family history, of cancer and his advanced age. If this request is granted, and Mr. Manna is released from BOP custody, procedures such as colonoscopies and follow up care can be freely and quickly scheduled by Mr. Manna and/or his family. Such liberty would allow Mr. Manna to experience his remaining years free from the anxiety and fear that his cancer will return, and comforted by the knowledge that if it were to return his family would ensure that he immediately receives the necessary treatment.

It is evident from the stacks of medical records we have received from the BOP, as well as his extensive BEMR File that Mr. Manna has required a significant amount of medical care and attention from BOP Health Services since he entered BOP custody nearly 3 decades ago in 1988. Mr. Manna is an older man with many ailments, and has served his sentence thus far without incident. This request for early release from BOP custody on compassionate

23

release grounds is justified for a man in Mr. Manna's position. An early release will afford Mr. Manna a measure of quality of life and comfort as someone who has struggled and continues to struggle daily with so many personal health issues. The BOP should consider that it has the ability to avoid liability for any potential risk to Mr. Manna by granting him an early release. Accordingly, in light of his advancing age, numerous chronic medical conditions, and their progressive nature, we would respectfully submit that Mr. Manna readily satisfies the second factor set forth in the Program Statement.

### 3. The inmate is experiencing deteriorating physical health that substantially diminishes their ability to function in a correctional facility

As should be obvious from the analysis above. Mr. Manna's extensive list of medical conditions would make daily life for any 90-year-old incredibly difficult, whether in custody or not. However, being confined to a correctional facility, and susceptible to those types of diseases known to spread quickly in such setting, these difficulties are seriously exuberated for Mr. Manna. Furthermore, beyond the ailments listed above, Mr. Manna suffers from high blood pressure, cellulitis, vertigo, ulcers, along with GI and bladder issues, making it difficult for him to use the bathroom, and more often than not requiring him to have someone assist him. This is an incredibly uncomfortable issue to have to deal with in a correctional setting, especially at Manna's age. In light of these added issues, and how they are exacerbated by the fact that Mr. Manna remains in custody, we respectfully submit that the third factor is satisfied

Mr. Manna's age. In light of these added issues, and how they are exacerbated by the fact that Manna remains in custody, we respectfully submit that this third factor is satisfied as applied to Mr. Manna.

24

**4.** *Conventional treatment promises no substantial improvement to their mental or physical condition*

Mr. Manna is an 90-year-old man suffering from a myriad of chronic physical health problems, each of which appears to be stagnant and/or worsening with age, In relation to these physical conditions, Mr. Manna is required to take various medications on a daily basis which taken cumulatively are likely very costly for the BOP. His daily regimen in the BOP Medical Staff's effort to control/maintain his conditions include the following: ammonium lactate lotion to treat his dry scaly skin conditions; ciprofloxacin to treat a variety of bacterial infections; clobetasol prop cream used to treat the inflammation and itching caused by his chronic skin problems; hydrocortisone acetate to rectify his skin issues; Lisinopril to treat his high blood pressure; loperamide capsule to treat diarrhea; meclizine to prevent and treat nausea, vomiting and dizziness caused by vertigo; metoprolol tartrate to treat his high blood pressure; phenazopyridine to relieve symptoms caused by irritation of the urinary tract; ranitidine used to treat and prevent ulcers in the stomach and intestines; simvastatin used to help lower bad cholesterol; and triamcinolone to treat his chronic skin issues.

Unfortunately, none of these prescriptions have provided substantial improvement to Mr. Manna's worsening condition. Further, these drugs do not even provide the promise of such improvement. These prescriptions are merely a Band-Aid, masking or maintaining conditions that will continue to find ways to progress and worsen as time passes. Accordingly, we respectfully submit that Mr. Manna's current circumstances satisfy the fourth requirement

**5.** *The inmate has served at least 50% of his sentence*

As mentioned at the outset of this letter, Mr. Manna received a sentence of 80 years and has served approximately 32 years in custody[6]. This equates to nearly 50% of his total sentence when factoring in approximately 5 years of good time credit that Mr. Manna has earned to date. In light thereof, we would respectfully submit that Mr. Manna satisfies the fifth and final point of consideration under this section. In further support of this determination, and far more importantly, both Dr. Ruben Morales, Clinical Director of FCI Fairton, as well as the Warden of FMC Rochester have both stated that they believe Mr. Manna is an appropriate candidate for a reduction in sentence.

Stated differently, Manna has completed more than 37 years of his sentence, (with good time incorporated) and he would have to do about 68 years of his sentence, pursuant to the BOP calculations of good time.

## A. A REDUCTION TO MR. MANNA SENTENCE WILL BE IN ACCORDANCE WITH THE POLICY STATEMENT OF SENTENCING COMMISSION DEPICTED IN U.S.S.G. § 1B1.13

The Sentencing Commission Policy Statement "U.S.S.G. § 1B1.13 provides that the Court may reduce a term of imprisonment if three conditions are met: (i) extraordinary and compelling reasons warrant the reduction, *id.* § 1B1.13(1)(A); (ii) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g), *id.* § 1B1.13(2); and (iii) the reduction is consistent with this policy statement", *id.* § 1B1.13(3).

---

[6] An inmate sentenced to 80 years would serve about 68 years of the sentence, of which Manna has served nearly 32 years of (about 47%).

26

The text of U.S.S.G. § 1B1.13, Application Note 1(A) states that "extraordinary and compelling reasons" exist where the defendant "is suffering from a serious physical or medical condition," "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," (U.S.S.G. § 1B1.13, Application Note 1(A)).

It is apparent that the circumstances presented in this case are extraordinary and compelling to justify the reduction of Mr. Manna's sentence and his release from detention.

As stated throughout, Manna is an aging man, who needs twenty-four-hour-seven-day-a-week attention, for nominal everyday tasks. Specifically, Manna has limited mobility and the need to depend on others to assist him to prevent any further damage from his susceptibility to slipping and falling.

Because of his acute conditions coupled with his age, Manna's health cannot be corrected, but only continue to decline. For instance, when Manna's major medical conditions pertaining to his stomach are considered (a) removal of a section of his colon; (b) colitis (c) and an angular hernia, all of which cause severe discomfort during bowl movements. That said, to avoid the aforesaid discomfort, Manna attempts to maintain a healthy diet, in an attempt to curb his bathroom habits, however he is limited due to what is readily available by the BOP. In sum, with age comes health issues of which Manna attempts to keep under control; however, the BOP is not equipped to attend to all his medical needs.

Additionally, Manna suffers from a bladder issue, which BOP attempted to cure 9 times with the use of antibiotics and has failed to properly rectify the same. More importantly, their futile attempts may have caused irreputable harm to Manna. In sum, as noted by Dr. McGee,

Manna is riddled with medical issues which must immediately be addressed, of which the BOP simply will not and cannot assist with.

### B. THE FACTORS SET FORTH IN SECTION 3553(a) WILL NOT PRECLUDE THE MODIFICATION OF MR. MANNA'S SENTENCE AND RELEASE

The language of 18 U.S.C. § 3582(c)(1)(A) also "requires a court to consider the factors set forth in § 3553(a) in considering whether to reduce a term of imprisonment. These factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" (4) the sentencing guidelines; and (5) "the need to provide restitution to any victims of the offense." (18 U.S.C. § 3553(a)). A federal court has the discretion to deny a motion for sentence modification or compassionate release that are not in accordance with the factors depicted in 18 U.S.C. § 3553(a).

Manna's alleged crimes occurred more than 30 years ago. Since, Manna has acted in accord with all rules in regulations, while in custody of the BOP. Under the circumstances, Manna has paid his debt to society. Now, in his 90's Manna seeks to spend his remaining years, before he dies, in the company of his family. Manna's sentencing is disproportionate to others,

28

as others in similarly situated would have been in a guideline range of 324-405 months.[7] (33.75 years in Custody without any credit for good time/ 28.7 with good time). With either of the aforesaid calculations, Manna would have been released from custody, to spend the remaining days with his family.

Again, Manna's request is reasonable under the current circumstances, as he fits squarely within the legislative intent of 18 U.S.C. 3582.

### C. THE INDIFFERENCE OF THE BOP VIOLATES MR. MANNA'S RIGHTS UNDER THE EIGHTH AMENDMENT – AS A "WOEFUL LACK OF CARE HAS BEEN PROVIDED TO MR. MANNA.

Inmates in federal detention facilities are entirely dependent on the officials of the BOP to care for their health needs, the federal agency has an "obligation to provide inmates with adequate medical care. (*Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)); [*18] (*Cruz v. Ward*, 558 F.2d 658, 661 (2d Cir. 1977)); (Waldo v. Goord, No. 97 Civ. 1385, 1998 U.S. Dist. LEXIS 15956, 1998 WL 713809, at *3 (N.D.N.Y. Oct. 1, 1998))." "Prison officials' deliberate indifference to an inmate's serious medical needs therefore constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Estelle*, 429 U.S. at 104; (*Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006)); (*Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000). "Such indifference may occur on an individual level, such as when a doctor intentionally mistreats an inmate, or on an institutional level, when the prison's system of medical care is so seriously inadequate as to cause unwarranted suffering."

-------------------

[7] Adjusted Level 40 Criminal History Category II.

29

(Cruz, 558 F.2d at 662). "The Eighth Amendment also guards prisoners against an unreasonable risk of future harm." (*Helling v. McKinney*, 509 U.S. 25, 33-38, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) (holding that inmate's contention that he was involuntarily exposed to second-hand smoke stated Eighth Amendment claim); (accord *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)); [*19]  (*Warren v. Keane*, 196 F.3d 330, 333 (2d Cir. 1999)); (Brown v. DeFrank, No. 06 Civ. 2235, 2006 U.S. Dist. LEXIS 83345, 2006 WL 3313821, at *20 (S.D.N.Y. Nov. 15, 2006); (*Atkins v. County of Orange*, 372 F. Supp. 2d 377, 408 (S.D.N.Y. 2005)); (cited in *Hall v. LeClaire*, 2007 U.S. Dist. LEXIS 36951, *17-19 (S.D.N.Y. May 22, 2007)).

Despite Manna's medical conditions, the BOP has unreasonably denied Manna necessary medical treatment. Dr. McGee has stated in sum and substance that pursuant to his recent review of Manna's medical records, which "showed an exemplary amount of detail," [h]owever, the recommendations based on [Dr. McGee's] assessment were severely lacking." McGee unequivocally states that in his medical opinion there a "woeful lack of care has been provided to Mr. Manna..." (**Exhibit A**)

That said, Manna is not receiving the proper medical treatment based on his current conditions. Thus, the BOP failure to do so, is nothing short of a violation of Manna's eight amendment, his right to be free from cruel and unusual punishment. No human should be denied basic medical treatment, that could inevitably assist with Manna's course of treatment.

### D. Additional Considerations

As previously noted, in considering a request for a Reduction in Sentence the Court must also evaluate the danger the inmate poses if released, as well as the risk that an elderly inmate

might commit an offense upon release, in addition to the five enumerated factors. In Mr. Manna's case, these additional considerations can be addressed rather concisely.

As an unwell, nearly 91-year-old man, Mr. Manna poses essentially no threat whatsoever to the community. Mr. Manna's only intentions, should this request be granted, are to move in with his step-son, John, and his wife, Mary; spend as much time as possible with his incredibly supportive, concerned, and loving family; and focus on staying as comfortable and as healthy as possible for whatever time he has left on this earth. After a 32-year custodial term, away from his family, suffering daily from the medical conditions described herein, Mr. Manna wants nothing more than a chance at a fresh-start and to spend his final years in the comfort and company of family, and has absolutely no intention of committing any type of offense whatsoever.

**E. Post Release Plan**

Should this request for a Reduction in Sentence be granted, Mr. Manna will resume residence with his stepson, John, and his wife, Mary. Mr. Manna will be under the constant watch and care of his family, who have supported him through this entire process. If this request is approved and a Motion for Reduction in Sentence on Mr. Manna's behalf is granted, he will rely fully on his family for financial support. If such a Motion is granted, Mr. Manna's family will be present around the clock to assist him with his transition back into society not only by providing him with a place to live and caring for him, but also by helping with the scheduling of doctor appointments, procedures, and filling prescriptions. If granted early release, Mr.

31

Manna with the assistance of his family, will find a new primary care physician and/or specialist(s) to ensure that there is no lapse in Mr. Manna's treatment regimen upon release.

## CONCLUSION

For the foregoing reasons, Mr. Manna respectfully requests that the Court modify his sentence pursuant to 18 U.S.C. 3582(c)(1)(A)(i). Should this Court wish to hold a hearing, counsel waives Mr. Manna's appearance and ask that Mr. Manna be allowed to appear telephonically, if feasible.

J. Iandolo Law, PC

*Jeremy M. Iandolo*

Jeremy M. Iandolo

7621 13th Avenue
Brooklyn NY 11228
718.305.1702
jiandolo@jiandololaw.com

32

## CERTIFICATE OF FILING AND SERVICE

I, Jeremy M. Iandolo, hereby certify that on September 21, 2020, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to all the registered CM/ECF users.


_____    //S//

Jeremy M. Iandolo, Esq.
7621 13th Avenue
Brooklyn, NY 11228
Phone: (718) 303.0802
Email: jiandolo@jiandololaw.com
Attorney for the Defendant