UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

LOUIS A. MANNA

Hon. Robert Kirsch, U.S.D.J.

Crim. No. 88-239 (RK)

---

OPPOSITION OF THE UNITED STATES TO DEFENDANT'S THIRD MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)

---

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
DISTRICT OF NEW JERSEY

ON THE BRIEF:
ALEXANDER E. RAMEY
ASSISTANT UNITED STATES ATTORNEY

The United States respectfully opposes the motion of defendant Louis A. Manna ("Manna") seeking a reduction of his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A). Due to the nature and circumstances of Manna's offense — RICO conspiracy to commit murder — release would not be consistent with the relevant sentencing factors set forth in 18 U.S.C § 3553(a). Accordingly, although the defendant's advanced age and serious medical conditions might otherwise render the defendant eligible for relief, an exercise of the Court's discretion to reduce Manna's sentence and release him from custody would not be in the interests of justice.

<u>BACKGROUND</u>

On August 25, 1988, Manna was charged with leading a conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO") in 9 counts of a 26-count Indictment in the matter of *United States v. Louis Anthony Manna, et al.*, No. 88-cr-239. Manna proceeded to trial, and, on June 26, 1989, was convicted on 7 counts, including violations of 18 U.S.C. § 1952 (RICO conspiracy to murder John Gotti, Gene Gotti, and Irwin Schiff and ordering the murder of Irwin Schiff); 18 U.S.C. § 371 (conspiracy to violate the Labor Management Relations Act, including by agreeing to solicit bribes in the construction industry); 18 U.S.C. § 1955 (conducting an illegal gambling business); and 18 U.S.C. § 1962 (racketeering). Manna was acquitted of charges under 18 U.S.C. §§ 891 and 892 (conspiracy to make extortionate extensions of credit) and 18 U.S.C. §§ 891 and 894 (conspiracy to use extortionate means to collect an extension of credit). On September 26, 1989,

Hon. Marianne Trump Barry, U.S.D.J., sitting in this District, sentenced Manna, then aged 60, to a term of 80 years of imprisonment for his crimes.

Manna's offense conduct is set forth in detail in the Final Presentence Report ("PSR") in this matter. *See* Gov. Ex. A. In sum, Manna was the Consigliere (third-in-command) of the Genovese Crime Family of La Cosa Nostra, who directly controlled a faction of the family including Martin Casella, Richard DeSciscio, Rocco Napoli, and Frank Daniello. PSR, ¶¶ 1, 26. Manna was an organizer and leader of the racketeering activity, as charged in the indictment and proven at trial, and all other defendants were subordinate to Manna. *Id.* at ¶ 59. Beginning in September 1987, Manna and some of his subordinates engaged in a conspiracy to murder John Gotti, the boss of the Gambino Family of La Cosa Nostra, and John's brother, Gene Gotti, another member of the Gambino Family. *Id.* at ¶ 30. On September 21, 1987, Manna's subordinate Daniello spoke to Manna about murdering John Gotti and Gene Gotti, concluding "I said the fuckin' godfather ain't getting' home." *Id.* at ¶ 30. In January 1988, Manna selected the individuals who were to participate in the "big hit" on John Gotti. *Id.* at ¶ 31. Manna also discussed the murder of Gene Gotti with his subordinate Casella, including the logistics involved in shooting Gene Gotti at the Federal Court House in Brooklyn, New York. *Id.* In discussing the planned murder, Manna was recorded stating "Gene Gotti's dead." *Id.* at ¶ 31.

During the period of late 1986 into early 1987, Irwin Schiff was a hidden principal in a network of companies and corporate shells that were engaged in

a multi-million-dollar fraud and money laundering scheme operated for the benefit of the Genovese Family. *Id.* at ¶ 32. Manna ordered Schiff's murder, and, on August 8, 1987, an unidentified masked gunman emerged from the restroom area of the Upper East Side restaurant where Schiff was dining and shot Schiff twice in the head. *Id.* at ¶¶ 32-33. In recorded communications, Manna and others referred to the Schiff murder while planning the Gotti murders. *Id.* at ¶ 34.

During the same period, Manna also conspired with his subordinate Napoli, the leader of a labor union, to extort contractors, plan construction deals beneficial to the criminal organization, provide sham union jobs for crime family members, and use union personnel for tasks for the criminal organization. *Id.* at ¶¶ 45-46.

From charge through to sentencing, Manna failed to accept responsibility for his crimes, declining to be interviewed by or provide any information to the United States Probation Office. *Id.* at ¶ 66.

Manna appealed his conviction after trial, and the Third Circuit affirmed on all counts without opinion. *United States v. Manna*, 919 F.2d 733 (3d Cir. 1990) (table). The United States Supreme Court then denied Manna's petition for certiorari. *Manna v. United States*, 499 U.S. 949 (1991). Manna then filed a series of lawsuits to compel the government to produce certain documents. In three separate rulings, a Court in this District upheld the withholding of those documents. *Manna v. Department of Justice*, 815 F. Supp. 798 (D.N.J. 1994); *Manna v. Department of Justice*, 832 F. Supp. 866 (D.N.J. 1994); *Manna v.*

4

*Department of Justice*, 1994 WL 808070 (D.N.J. April 13, 1994). The Third Circuit affirmed those rulings, *Manna v. Department of Justice*, 51 F.3d 1158 (3d Cir. 1994), and the Supreme Court again denied Manna's petition for certiorari. *Manna v. Department of Justice*, 516 U.S. 975 (1995). Manna then filed a series of petitions for habeas corpus, which were denied in 2004 and 2006, as well as other post-conviction motions, the most recent of which, prior to his motions for compassionate release, was denied in 2011.

Defendant has served approximately 34 years of his sentence and is currently housed at Federal Medical Center Rochester ("FMC Rochester"), an administrative security[1] medical facility in Rochester, Minnesota, housing approximately 796 male inmates. His release date is November 7, 2054. Accordingly, the defendant has roughly 30 years left to serve on his sentence. The defendant is 94 years old (turning 95 in December) and will not survive to be released.

On or about November 4, 2019, while Manna was still housed at Federal Correctional Institution Schuylkill in Pennsylvania, he was evaluated for early release and found potentially eligible for release under the First Step Act with a low-level risk of recidivism. *See* ECF No. 16-2, Def. Ex. B. Thereafter, Manna was transferred to FMC Rochester, where he submitted a request for

---

[1] Administrative facilities are institutions with special missions, such as the detention of pretrial offenders; the treatment of inmates with serious or chronic medical problems; or the containment of extremely dangerous, violent, or escape-prone inmates. Most administrative facilities, including FMC Rochester, are capable of holding inmates in all security categories. *See* https://www.bop.gov/about/facilities/federal_prisons.jsp.

consideration for compassionate release under Title 18, United States Code,

Section 3582(c). The Warden of FMC Rochester received Manna's request and

approved it on April 24, 2020, forwarding it to BOP's Office of the General

Counsel ("OGC") for the next step in the approval process. *See* Gov. Ex. B.

While his request was still under consideration by OGC, Manna submitted his

release plan to FMC Rochester, proposing to live with his step son and his step

son's wife in Bayonne, New Jersey. *Id.* A social worker at FMC Rochester

conducted an investigation into Manna's proposed release plan and approved it

on May 12, 2020, noting that Manna appeared to "have the support and

resources necessary for successful re-entry." *See* Gov. Ex. C. Thereafter, in a

letter dated September 1, 2020, OGC issued its final decision denying Manna's

request for compassionate release. *See* ECF No. 16-4, Def. Ex. C. The OGC

explained that it had carefully reviewed Manna's request and accompanying

documentation, as well as consulted with the BOP's Medical Director, in

evaluating Manna's request. The OGC reviewed Manna's request under

Sections 3(b) and 4(b) of the BOP's Program Statement 5050.50.[2] The OGC set

forth its reasoning in denying Manna's request as follows:

---

[2] It is not stated whether Manna's request was also evaluated under Section
4(a) of the Program Statement. Based on the Program Statement language
quoted in the OGC's letter and the eligibility requirements discussed therein, it
does not appear that it was.



On September 23, 2020, Manna moved before this Court, Hon. Peter G. Sheridan, U.S.D.J., presiding, under 18 U.S.C. § 3582(c)(1)(A) for a reduction in sentence resulting in his immediate release from the custody of the BOP due to, *inter alia*, his medical conditions and the threat posed by the COVID-19 pandemic (Manna's "First Motion"). *See* ECF No. 16.

On October 16, 2020, the United States opposed Manna's First Motion. The government argued that Manna's motion was brought under the incorrect legal standard, that Manna's medical records showed that he could not demonstrate extraordinary and compelling circumstances for his release, and that the applicable Section 3553(a) factors weighed strongly against any exercise of the Court's discretion to release Manna. *See* ECF No. 19. The Court, Hon. Peter G. Sheridan, U.S.D.J., presiding, held oral argument by telephone

conference on October 20, 2020. *See* ECF No. 23. The Court posed questions to the parties, which they addressed in supplemental briefing. Manna filed reply briefs on October 20, 2020, ECF No. 20; and October 27, 2020, ECF No. 21. The government responded in a surreply on October 28, 2020. *See* ECF No. 22.

On December 4, 2020, Judge Sheridan denied Manna's First Motion. The Court ruled that, contrary to the government's position, Manna had demonstrated extraordinary and compelling reasons for release. *See* ECF No. 24, p. 10 ("However, Manna's advanced age and his medical conditions, plus the risk of contracting COVID-19, together render his situation extraordinary and compelling – as he is 91 years of age."). Judge Sheridan went on, however, in agreement with the government's position, to find that the Section 3553(a) factors precluded Manna's release. The Court held:

> Here, the § 3553 factors also weigh against modifying the sentence. The § 3553 factors direct the Court to examine the nature and circumstances of the offenses committed, as well as the nature and characteristics of the defendant. Here, both factors merge together. Manna was a leader in the Genovese family, a street boss, who accomplished LCN goals through violence and intimidation. Despite the fact that he is considered "frail" and has some medical issues, the nature of his life as a career criminal and his leadership in the Genovese family outweigh his age and medical issues. As such the motion is denied.

ECF No. 24, p. 11.

Several months later, on April 28, 2021, Manna filed another motion, this one styled as a "Writ of Habeas Corpus and Motion to Set Aside Judgment and Sentence." (Manna's "Second Motion"). *See* ECF No. 26. Manna's attempt to file a civil habeas claim in his criminal case was untimely and procedurally improper. Manna's motion, however, was confusingly worded and could

potentially have been construed as a motion seeking reconsideration of his First Motion. On June 10, 2021, Judge Sheridan denied Manna's habeas motion as improper, denied Manna's Second Motion — if intended as a motion for reconsideration — as facially deficient, and permitted Manna to refile his Second Motion after properly exhausting his administrative remedies to the extent it was intended as a new motion seeking compassionate release. *See* ECF No. 29.

Manna refiled his Second Motion, this time clearly styled as a second, successive motion for reduction in sentence and compassionate release, on October 20, 2021. On October 26, 2021, Manna's counsel submitted a letter to the Court seeking to have his Second Motion heard on an emergency basis, claiming that Manna's rapidly declining health necessitated curtailing the briefing schedule. Judge Sheridan heard oral argument on Manna's emergency request on November 4, 2021. The United States opposed Manna's Second Motion on the same grounds previously found by the Court in its December 4, 2020 Opinion, as well as on the grounds that Manna had failed to exhaust administrative remedies on his new claim. The government obtained updated medical records for Manna and, on November 10, 2021, filed an opposition letter brief outlining how those records failed to support Manna's procedurally barred claim. *See* ECF No. 39.

On November 16, 2021, Judge Sheridan denied Manna's Second Motion. The Court again found that Manna had demonstrated extraordinary and

compelling circumstances making him eligible for relief, but that the Section

3553(a) factors precluded any reduction in Manna's sentence:

> Considering Manna's poor health, age, and risk of severe complications
> from COVID-1 9, Manna has demonstrated extraordinary circumstances
> which could justify a sentence reduction, and he has satisfied the second
> prong required for a sentence reduction. 18 U.S.C. § 3582(c)(1)(A).
> . . .
> [T]he § 3553 factors nevertheless weigh against a sentence reduction
> whether or not this Court considers the additional health concerns
> outlined in Manna's October 26, 2021 letter. Manna conspired to murder
> several people, and successfully killed Irwin Schiff. He was a leader of the
> Genovese crime family, a role he performed through violence and
> intimidation. (Order of Dec. 4, 2020, Denying Sentence Reduction, ECF
> No. 24). His numerous crimes were extremely serious and heinous. As
> such, the nature and circumstances of the convicted offenses and the
> history and characteristics of the defendant are important sentencing
> objectives that would not be served by modifying Manna's sentence.

ECF No. 41, p. 4. The Court also resoundingly rejected Manna's contention

that the denial of his Second Motion would implicate his constitutional right to

equal protection under the law due to differing treatment based on his Italian

ethnicity. *Id.* at pp. 4-5.

On July 10, 2024, Manna submitted a new request for early release to

the Warden of FMC Rochester. *See* Gov. Ex. D. After initially denying the

request, the Warden changed course and approved Manna for early release on

August 5, 2024. *See* Def. Ex. A; Gov. Ex. E. Manna's administrative request for

early release is now pending with the BOP's Central Office. The United States

has requested updates from the BOP on the status of Manna's administrative

proceeding, which remains unresolved. According to BOP Northeast Regional

Counsel, as of August 30, 2024, Manna's early release request was awaiting

review at BOP's Central Office. As of September 17, 2024, however, Manna's

10

request had been procedurally returned to the Warden of FMC Rochester for resubmission.  Manna's administrative request remains pending, but BOP is unable to provide any estimate as to when it will be finally decided and cannot make any representation as to what the ultimate outcome will be.

On August 26, 2024, Manna filed his present, Third Motion for compassionate release (erroneously titled his "Second Motion"), arguing for release based on his many health problems, most notably his 2024 diagnosis ████████████. With Judge Sheridan having retired, on August 27, 2024, the matter was transferred to Hon. Robert Kirsch, U.S.D.J. The United States made diligent efforts to investigate Manna's medical claims by obtaining and reviewing Manna's most recent BOP medical records. *See* Gov. Exs. F (BOP Health Services Clinical Encounter Report, dated August 7, 2024) and G (BOP Health Services Clinical Encounter Report, dated September 17, 2024).[3] As set forth below, Manna has adequately exhausted his administrative remedies and his Third Motion for reduction in sentence and compassionate release is now properly before the Court. Moreover, Manna's ███████ diagnosis and the collateral health consequences of his treatment █████████ establish extraordinary and compelling reasons making him eligible for relief under Section 3582(c)(1)(A). Nevertheless, Manna's Third Motion should be denied because his extremely serious criminal conduct in leading a RICO conspiracy

---

[3] The government obtained over 1,200 pages of medical records for the defendant for the year 2024 alone, but has excerpted out two reports that summarize the medical findings relevant to the defendant's motion. The government can make all of the records available to the Court upon request.

to commit murder, along with the other applicable Section 3553(a) factors, weighs strongly against his release. Manna's recent diagnosis and treatment do nothing to disturb the findings from the Court's prior orders denying Manna's previous release motions.

LEGAL FRAMEWORK

Title 18, United States Code, Section 3582(c)(1)(A) provides, in relevant part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).[4]

---

[4] Manna's Third Motion also makes reference to § 3582(c)(1)(A)(ii), which deals with sentences imposed "under section 3559(c)," and is inapplicable here. 18 U.S.C. § 3582(c)(1)(A)(ii). Section 3559(c) deals with mandatory life sentences for certain serious violent felonies.

Under this provision, "[a] prisoner may file a motion for compassionate release with the sentencing court 'after [he or she] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.'" *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A) (emphasis removed)). Exhaustion of administrative remedies before filing in the District Court is mandatory. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release"). "Under 18 U.S.C. § 3582(c)(1)(A), commonly referred to as the 'compassionate release' provision, district courts may reduce a term of imprisonment when warranted by "extraordinary and compelling reasons.' If a court finds those reasons exist, it then turns to the sentencing factors in 18 U.S.C. § 3553(a) to determine whether compassionate release is appropriate. *See* § 3582(c)(1)(A)(i)." *United States v. Stewart*, 86 F.4th 532, 533 (3d Cir. 2023) (quoting 18 U.S.C. § 3582(c)(1)(A)). The defendant seeking compassionate release "bears the burden of proof by a preponderance of the evidence." *United States v. Grasha*, 489 F. Supp. 3d 403, 406 (W.D. Pa. 2020); *see also United States v. McNair*, 481 F. Supp. 3d 362, 365 (D.N.J. 2020) (defendant "bears the burden of satisfying both that he has (1) exhausted remedies before seeking judicial review, and (2) that compelling and extraordinary reasons exist to justify compassionate release.") "A grant of compassionate release is a purely discretionary decision."

13

*Stewart*, 86 F.4th at 534 (citing *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020)). A District Court's decision on granting or denying a motion for reduction in sentence is therefore reviewed only for abuse of discretion and will not be disturbed on appeal unless it gives rise to "a definite and firm conviction that [the Court] committed a clear error of judgment in the conclusion it reached." *Id.* (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000)).

In sum, a court's consideration of a defendant's motion proceeds in three steps: (1) Exhaustion: identifying whether the defendant has exhausted his administrative remedies prior to filing; (2) Eligibility: determining whether the defendant has established that he is eligible for relief by showing that "extraordinary and compelling reasons warrant . . . a reduction" in his sentence; and (3) Discretion: determining whether the reduction of the eligible defendant's sentence is supported by the Section 3553(a) factors and the Sentencing Commission's policy statements, such that an exercise of the Court's discretionary authority is warranted.

## ARGUMENT

Here, Manna has exhausted his administrative remedies and demonstrated his eligibility for relief, but has failed to carry his burden to show that a discretionary exercise of the Court's authority to grant compassionate release is warranted under Section 3582(c)(1)(A)(i). The applicable Section 3553(a) factors, particularly the nature of circumstances of his RICO offense involving murder and conspiracy to commit murder, weigh strongly against granting the defendant's motion.

A.  The Defendant Has Exhausted His Administrative Remedies.

As a threshold issue, as explained above, Section 3582(c)(1)(A) requires that a request for a reduction in sentence be presented first to the BOP for consideration. Only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's denial or failure to act, may a defendant move for a sentence reduction in court. That restriction is mandatory. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point.")

Here, the defendant has adequately exhausted administrative remedies because more than 30 days have passed between the receipt of his initial request by the Warden of FMC Rochester (submitted July 10, 2024) and the filing of his present motion before the Court on August 26, 2024. Nevertheless, for the reasons set forth below, Manna's request for a reduction in sentence resulting in his immediate release should be denied on the merits.

B.  The Defendant Is Eligible for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13.

Manna's present medical circumstances constitute extraordinary and compelling reasons making him eligible for relief under Section 3582(c)(1)(A)(i). The Sentencing Commission's Policy Statement provides, in relevant part:

(b) EXTRAORDINARY AND COMPELLING REASONS. — Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

15

(1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT.—

(A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), endstage organ disease, and advanced dementia.

(B) The defendant is—
(i) suffering from a serious physical or medical condition,

(ii) suffering from a serious functional or cognitive impairment,

Or

(iii) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility
and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(A)-(B).

Manna has been diagnosed ██████████████████████████████████████
███████████████████. *See* Gov. Ex. G, p. 5. ██████████████████████

███████████████████████████████████████████████████████████████

██████████. *Id.* ██████████████████████████████████████████████

██████████████████████████████. *See* Gov. Ex. F, p. 7. ███████████████

█████████████████████████████████████████████████████████████.

*Id.* p. 3. ████████████████████████████████████████████

███████████████████████████████████. *See* Ex., G p. 6. ███████████████

████████████████████████████████. *Id.* p. 1.

Accordingly, the defendant appears eligible for relief under Section 1B1.13(b)(1)(A) of the Policy Statement ████████████████████ ████, and under Section 1B1.13(b)(1)(B)(i) ██████████████ ████████████████████████████████████ ████████████████████████. Eligibility, however, does not equate to entitlement to relief. The Court must still review the facts of the defendant's case to determine whether an exercise of discretionary authority to reduce the defendant's sentence is appropriate. Here, any such reduction is not.

C. The Defendant's Motion Should Nevertheless Be Denied Based on the § 3553(a) Factors.

Despite Manna's eligibility for relief, the Court should nevertheless exercise its discretion to deny Manna's motion based on the weight of the Section 3553(a) factors. Manna was a major figure in organized crime, who occupied a leadership role in a racketeering conspiracy that planned to murder two individuals and successfully murdered another. At the time it was imposed, his 80-year sentence necessarily contemplated his spending the remainder of his life in prison. Nothing that has occurred in the intervening years has fundamentally altered the factors presented to the original sentencing judge.

Section 3553(a) provides in relevant part that the Court "shall consider":

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;
. . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. 3553(a).

1. <u>Nature and Circumstances of the Offense</u>

First and foremost, the defendant's violent and egregious conduct in the offenses of conviction, including participating in multiple conspiracies to commit *murder*, and ordering an actual *murder*, weighs against any reduction. 18 U.S.C. § 3553(a)(1). As the District Court in one of Manna's post-conviction lawsuits noted:

Before being incarcerated, [Manna] held the number three position of "consigliere" for over eight years in a powerful Mafia crime family—the Genovese Crime Family. In the Northern New Jersey–New York Metropolitan area, the Genovese LCN Family has historically been one of the most powerful of the American Mafia criminal organizations. Today, the New Jersey contingent of the Genovese Family, through an entrenched network of racketeering operations, preys upon the transportation, shipping and construction industries. The Genovese LCN Family uses violence, intimidation and obstruction to further its organized criminal activities.

*Manna v. U.S. Dep't of Justice*, 815 F. Supp. 798, 802 (D.N.J. 1993), *aff'd*, 51 F.3d 1158 (3d Cir. 1995) (citations omitted). The District Court highlighted the

18

continuing danger posed by Manna at that time in denying Manna's request for

documents under FOIA, noting:

> the LCN, specifically the Genovese LCN Family, has a long, sordid and
> bloody history of racketeer domination and exploitation. [Manna],
> although physically confined in a penitentiary, has not severed his ties to
> the Genovese Crime Family. Because the LCN is so violent and
> retaliatory, the names of interviewees, informants, witnesses, victims and
> law enforcement personnel must be protected. Everyone of the major
> LCN leadership level defectors in recent years has stated and/or testified
> that only slight suspicion is needed before deciding to kill a suspected
> informant. With very few exceptions, the mere accusation by a member
> in good standing is sufficient to precipitate the issuance of a death
> warrant from the hierarchy.

*Id.* at 808. Manna's central role in a violent criminal organization and his direct

involvement in the murder of Irwin Schiff and multiple conspiracies to commit

murder weigh strongly against any reduction in sentence.

   2. <u>Reflecting the Seriousness of the Offense, Promoting Respect for the Law,
   and Imposing Just Punishment</u>

   Second, although 80 years is certainly a very substantial sentence, with

conduct so egregious there is a real need to maintain the sentence imposed to

reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense. *Id.* at § 3553(a)(2)(A). The RICO statute

under which Manna was convicted by design carries enhanced penalties to deal

with the uniquely deleterious effects on society of organized crime. The

Supreme Court observed as much in one of the key cases interpreting the law:

> The statement of findings that prefaces the Organized Crime Control Act
> of 1970 reveals the pervasiveness of the problem that Congress was
> addressing by this enactment:
>
> > "The Congress finds that (1) organized crime in the United States is
> > a highly sophisticated, diversified, and widespread activity that annually

drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; . . . ." 84 Stat. 922–923.

In light of the above findings, it was the declared purpose of Congress "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, *by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies* to deal with the unlawful activities of those engaged in organized crime." *Id.*, at 923.

*United States v. Turkette*, 452 U.S. 576, 588–89 (1981) (emphasis added).

Congress thus stressed the seriousness of offenses like Manna's, which "corrupt legitimate business," "subvert . . . our democratic processes," "weaken the stability of the Nation's economic system, [and] undermine the general welfare of the Nation and its citizens." *Id.* at 588. Congress also explicitly found "enhanced sanctions" necessary to achieve its purposes in eradicating such crime. *Id.* at 589. Thus, to grant compassionate release in cases like the one before the Court, where the thrust of the defendant's argument is primarily based on the length of his time served and the collateral effects thereof, would frustrate the manifest intent of Congress in passing the RICO laws to impose such severe punishments. The import of the District Court's decision in sentencing the then 60-year-old Manna to 80 years'

imprisonment cannot be mistaken. Requiring RICO defendants, including the defendant, to serve the sentences imposed promotes respect for the law, encourages general deterrence of conduct that Congress has identified as uniquely harmful, and ensures just punishment for such offenses consistent with Congress's intent.

3. Deterrence

As to specific deterrence and protection of the public *Id.* at § 3553(a)(2)(B)-(C), the government concedes that specific deterrence and protection of the public from the defendant are likely not at issue. As noted above, however, general deterrence supports leaving the defendant's sentence undisturbed.

4. Rehabilitation

Additionally, while "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for a reduction in sentence, 28 U.S.C. § 994(t), the Court may consider it in connection with the other factors under Section 3553(a). Here the defendant's rehabilitation efforts set forth the his Third Motion fail to outweigh the severity of his crimes.

5. Avoiding Unwarranted Disparity in Sentencing

Finally, much of the defendant's Third Motion is directed to the factor of potential disparity in sentencing. 18 U.S.C. § 3553(a)(6). None of the defendant's arguments, however, meet his burden to tip the scales in favor of release.

The defendant argues that this Court should follow the lead of another court in this District, which granted a compassionate release motion in the matter of *United States v. Grecco*, No. CR 89-00250, 2022 WL 17080748 (D.N.J. Nov. 18, 2022). While the government may disagree with the reasoning in *Grecco*, that case is clearly distinguishable from the one at bar for the simple reason that the movant defendant in *Grecco* was, as the court observed, actually "acquitted of committing Racketeering Act One 'by means of murder.'" *Id.* at *2 n. 6. The jury in *Grecco* had been presented with special interrogatories and found that the government had not met its burden to show the murder predicate of the charged RICO conspiracy. *See* 89-cr-250 (SDW), ECF No. 30-1, p. 172. While the defendant was still found guilty of the RICO offense, and the murder guideline was still applied at the lower standard of proof at sentencing, it was certainly fair for the *Grecco* court to consider the strength of the evidence as part of the nature and circumstances of that defendant's offense conduct.

The defendant's citation to the decision in *Grecco* illustrates the inherent hazard in attempting to draw conclusions from small sample sizes. While one judge in the District granted a motion in *Grecco*, another denied a series of motions for defendants sentenced under the murder Guideline. For example in *United States v. Balter*, No. CR 93-536 (RBK), 2024 WL 2105553, at *1 (D.N.J. May 9, 2024), Judge Kugler denied the third successive compassionate release motion of the 77-year-old defendant who had been sentenced to life in prison for murder-for-hire, in violation of 18 U.S.C. § 1958. The Judge wrote "the

22

Court is willing to assume for purposes of this Opinion that Mr. Balter's deteriorating health and advanced age rise to the level of extraordinary and compelling reasons for a sentence reduction." *Id.* at *4. The Court nevertheless denied Balter's motion because "[a] reexamination of the nature and circumstances of Balter's offense, . . . reveal it to be an especially heinous crime," and "Balter's release would send the wrong message to the public about the gravity of his offense." *Id.* The court concluded that "denying Balter's motion best promotes respect for the law, provides just punishment, and sends the message to society at large that the justice system will respond aggressively to crimes of this nature." *Id.* at *5. The same result is warranted here. *See also United States v. Fermin*, No. CR 96-114 (RBK), 2024 WL 1479155, at *6 (D.N.J. Apr. 5, 2024) (denying compassionate release motion of 68-year-old RICO murder conspiracy defendant); *United States v. Garcia*, No. CR 93-536 (RBK), 2024 WL 749010, at *9 (D.N.J. Feb. 23, 2024) (denying compassionate release motion of murder-for-hire-defendant, collecting cases).

The available national statistics from the United States Sentencing Commission also belie any suggestion that the defendant's 80-year sentence is evidence of unwarranted sentencing disparity. Manna was sentenced as an offense level 47, criminal history category I, resulting in a Guidelines range of life imprisonment. PSR, ¶ 146. Then, as now, that offense level is literally off the chart, being four levels above the maximum Guideline range of life imprisonment at level 43. Manna's offense level was the result of a base offense level of 43 under U.S.S.G. § 2A1.1, with an additional enhancement of four

levels for being a leader/organizer of the criminal enterprise under § 3B1.1. PSR, ¶¶ 87, 90, 92. Those Guidelines provisions remain the same today as they were when Manna was sentenced. Indeed according to the Sentencing Commission, in the period from 2019 through 2023 — the most recent 5-year period for which records are available — 416 defendants were sentenced at criminal history category I for murder offenses under 2A1.1. *See* Gov. Ex. H. Of those defendants just 17.8% chose, like Manna to go to trial. *Id.* Out of the total pool of those who went to trial and those who chose to plead guilty, 18.5% of defendants received life sentences and another 18.5% received sentences between 30 years and life. *Id.* Manna's sentence was the result of his serious crimes, and there's no indication that his sentence was disproportionately long or unduly harsh, even were he sentenced today.

The defendant's arguments concerning the "average" sentence imposed for murder offenses are similarly unavailing. In the 2019 through 2023 period, the mean average sentence for a murder defendant at category I under Section 2A1.1 was 280 months' imprisonment and the median average was 264 months' imprisonment. Ex. H. These figures however have no application to the defendant's case for many reasons. The first, and most important, is that for the purpose of calculating averages, the sentencing commission treats all sentences of more than 470 months, including life sentences, as sentences of 470 months. *Id.* This means that in calculating the average for murder defendants, the defendant's own 960 months sentence would be cut down to 470 months' imprisonment. Secondly, and equally importantly, that average

24

includes all defendants who accepted guilty pleas, including those who benefitted from cooperation departures. The government is not aware of any separately kept data for defendants who, like Manna, never accepted responsibility and were convicted at trial, but the data available shows that the average would certainly be significantly higher, as is borne out by the distribution of sentences actually received, including 18.5% life sentences.

Accordingly, in light of the Defendant's violent and egregious offense conduct, his leadership role within La Cosa Nostra, and the totality of the relevant circumstances, the Section 3553(a) weigh strongly against release, and the Court should deny Manna's motion for a reduction in sentence.

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Defendant's motion for a reduction in sentence and compassionate release should be denied.

Respectfully submitted,

PHILIP SELLINGER
UNITED STATES ATTORNEY

By:     s/ Alexander E. Ramey

ALEXANDER E. RAMEY
ASSISTANT UNITED STATES ATTORNEY