UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LOUIS MANNA | Crim. Action No. 88-00239 (RK)<br><br>**OPINION** |

**KIRSCH, District Judge**

     **THIS MATTER** comes before the Court upon Defendant Louis Anthony Manna's ("Bobby" or "Mr. Manna") third motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) (the "Motion," ECF No. 63).[1] (*See* "Mot. Br.," ECF No. 64.) The Government opposes the Motion. (*See* "Opp. Br.," ECF No. 66.) The Court heard oral argument on the Motion and took limited testimony on April 14, 2025. (*See* ECF No. 73.) For the reasons below, the Motion is **GRANTED**.

**I.    BACKGROUND**

     Mr. Manna, 95 years old, is indisputably frail and in failing health. (*See* Presentence Report, "PSR," Opp. Br. at Ex. A, at 1; Mot. Br. at 1.) The parties stipulated on the record ("OTR") that he has been incarcerated for more than 36 years, serving an 80-year sentence handed down in 1989 in this District by the Honorable Maryanne Trump Barry, U.S.D.J. ("OTR Stip.," ECF No. 74, at 5:03–6:21.) His release date is set for November 7, 2054, meaning he has twenty-nine years of incarceration remaining. (Opp. Br. at 5.) He obviously will not live long enough to reach his release date.

---

[1] Although this filing is labeled as Mr. Manna's "Second Motion for Compassionate Release," he has filed for compassionate release on two previous occasions. (*See* ECF Nos. 16, 32.) Thus, this is Mr. Manna's third motion for compassionate release.

In recent years, Mr. Manna's health has significantly deteriorated while incarcerated at the Federal Medical Center Rochester ("FMC Rochester") in Minnesota. A medical summary issued by FMC Rochester in September 2024 reveals forty separate diagnoses, including lung cancer, stroke, Parkinson's disease, chronic kidney disease, recurring MRSA, and hypertension.[2] (ECF No. 67-1 at 1–2 (noting Mr. Manna "began experiencing more medical problems" within the last two years).) The parties stipulated that his lung cancer has recently been found to be "high-risk." (*See* OTR Stip. at 8:14–23.) The Government notes it obtained "over 1,200 pages of medical records" for Mr. Manna "for the year 2024 alone." (Opp. Br. at 11 n.3.)

### A. PRE-SUBJECT OFFENSE CRIMINAL HISTORY

Mr. Manna's history of egregious criminal conduct, including his active and high-level involvement in organized crime, *i.e.*, "La Cosa Nostra," and his personal commissions of crimes of violence, exploitation, and intimidation are notorious and not in dispute. (PSR ¶¶ 1–6, 8, 15–17, 19, 119–136.) His criminal history dates back to mid-1952, when as a 22-year old longshoreman, he and a group of associates severely beat a victim who was attempting to recruit members to a rival local union. (*Id.* ¶ 119.) Thereafter, he was subject to arrests for a variety of state and federal offenses, including for weapons, extortion, assault and battery, and for being a material witness to separate incidents of murder and the bombing of a union headquarters. (*Id.* ¶¶ 123–127.)

Multiple investigations into organized crime operations in and around New Jersey dating back to the late 1960s and thereafter established that Mr. Manna was a "made" member of the Genovese Crime Family, oversaw the "Manna Faction" of the Family, and served in leadership

---

[2] At the April 14, 2025 hearing, defense counsel advised there was no objection to the Court's citing to medical records and diagnoses as set forth in medical documents defense counsel provided to the Court. (OTR Stip. at 4:09–11.)

positions including "Street Boss" and "Caporegime," ascending ultimately to "Consigliere," the third-highest ranking member who reported directly to the Boss of the Family.[3] (*Id.* ¶¶ 2, 27, 129, 134–136, 182.) Mr. Manna's stature within organized crime included his active and intimate involvement with a literal "who's who" of notorious gangsters. He reported at various times to Genovese Underboss "Fat" Tony Salerno and Boss Vincent "Chin" Gigante, and as explained below, was actively involved in a plot to kill John Gotti, the head of the Gambino Crime Family, and his brother Gene, a captain in the same Family. (*Id.* ¶ 27, 30, 136); *see* Marvine Howe, *Gotti's Brother is Sentenced to 50 Years*, N.Y. Times, Jul. 8, 1989, at 25. If the conduct here were not so deadly serious, the nicknames of Mr. Manna's associates would ring farcical, maybe comedic: "Tony Frogs"; "Sammy Legs"; "Billy the Butcher"; and "Benny Eggs." (PSR ¶¶ 27, 127, 135.)

### B. SUBJECT CRIMINAL OFFENSES

Mr. Manna's criminal conduct culminated in the subject convictions pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") for offenses involving conspiracy to commit murder, extortion, loansharking, and gambling activities. (*Id.* ¶¶ 1–2.) The time-period of Defendant's RICO-related criminality as set forth in the Indictment spanned from 1977 to late 1988. (OTR Stip. at 5:03–09; Opp. Br. at 2.)

Evidence adduced at trial established Mr. Manna's integral role in the murder of Irwin Schiff and the plan to kill John and Gene Gotti. Mr. Schiff was a "Genovese Family connected businessman," who was "a hidden principal in a network of companies and corporate shells which were engaged in a multi-million-dollar fraud and money laundering scheme." (PSR ¶ 32.) Substantial sums of money were siphoned from these companies and were funneled to the

---

[3] The "Consigliere" was the third-highest position of authority within the Genovese Crime Family. (PSR ¶¶ 2, 27.) As the leader of the Manna Faction of the Family, Mr. Manna "ordered, conducted and conspired in acts of murder, extortion, labor payoffs, loansharking, and gambling." (*Id.* ¶ 2.)

Genovese Crime Family. (*Id.*)

On August 8, 1977, at around 10:30 p.m., a masked gunman emerged from the restroom at Bravo Sergio Restaurant on the Upper East Side of Manhattan and shot Mr. Schiff twice in the head, killing him. (*Id.* ¶¶ 32–33.) Recorded communications established that Mr. Manna ordered the hit ("Bobby picked this kid [the shooter] out."). (*Id.* ¶¶ 33.) With respect to Mr. Manna's present Motion, the Court directed the Government to locate Mr. Schiff's next-of-kin to seek their input on Mr. Manna's application for release from federal prison. (*See* ECF No. 69.) The Government confirmed on the record that its investigations team, which included federal law enforcement, could not locate any close relatives of Mr. Schiff's still alive. (OTR Stip. at 7:13–24.)

As Mr. Manna and co-conspirators discussed the Schiff murder, they also were in the process of planning another set of murders: John and Gene Gotti. While Mr. Manna was convicted of this plot as part of the RICO conspiracy, the murders were never consummated. John Gotti was subsequently tried, convicted, and sentenced to life in prison for charges of RICO, murder, obstruction of justice, and others. Arnold H. Lubasch, *Gotti Sentenced to Life in Prison Without the Possibility of Parole*, N.Y. Times, June 24, 1992, at A1. He died in federal prison at the age of 61. Selwyn Raab, *John Gotti Dies in Prison at 61; Mafia Boss Relished the Spotlight*, N.Y. Times, June 11, 2002, at A1. In a separate trial, Gene Gotti was convicted of leading a heroin distribution ring and served 29 years in federal prison. Howe, *Gotti's Brother is Sentenced to 50 Years, supra*. He was released in 2018. Larry McShane, *Gene Gotti, brother of mob boss John, finishes 29-year prison term this month*, N.Y. Daily News (Dec. 12, 2018), https://www.nydailynews.com/2018/09/03/gene-gotti-brother-of-mob-boss-john-finishes-29-year-prison-term-this-month/.

4

On August 25, 1988, Mr. Manna was charged with leading a conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO") in nine counts of a twenty-six-count indictment. (PSR ¶¶ 1, 19.) Mr. Manna was ultimately convicted of various offenses under RICO, 18 U.S.C. § 1961 *et seq.*, involving the conspiracies to murder Irwin Schiff, John Gotti, and Gene Gotti, and ordering the murder of Irwin Schiff. (PSR ¶ 19.) He was also convicted of counts pursuant to 18 U.S.C. § 371 (conspiracy to violate the Labor Management Relations Act, including by agreeing to solicit bribes in the construction industry); 18 U.S.C. § 1955 (conducting an illegal gambling business); and 18 U.S.C. § 1962 (racketeering). (*Id.*) Prior to sentencing, Mr. Manna declined to be interviewed or to provide any information to the United States Probation Office. (PSR ¶ 66.) At sentencing, Judge Trump Barry sentenced Mr. Manna, then 60 years old, to 80 years of imprisonment. To date, as stated, Mr. Manna has served more than 36 years in prison.

After trial, Mr. Manna appealed his conviction to the Third Circuit, which affirmed Judge Trump Barry without issuing a written opinion. *United States v. Manna, et al.*, No. 88-cr-239 (D.N.J. Oct. 12, 1989), *aff'd without opinion*, 919 F.2d 733 (3d Cir. 1990), *cert. denied,* 499 U.S. 949 (1991). Mr. Manna also appealed to the United States Supreme Court, but his petition for a *writ of certiorari* was denied. *See id.* Since his conviction, Mr. Manna has filed a variety of post-trial motions and a series of petitions for *habeas corpus. E.g., Manna v. Dep't of Just.*, 815 F. Supp. 798 (D.N.J. 1993); *Manna v. Dep't of Just.*, 832 F. Supp. 866 (D.N.J. 1993); *Manna v. Dep't of Just.*, No. 93-81, 1994 WL 808070 (D.N.J. Apr. 13, 1994); *Manna v. Dep't of Just.*, 51 F.3d 1158 (3d Cir. 1995); *United States v. Manna*, No. 97-2034, 2006 WL 3063456 (D.N.J. Oct. 25, 2006). He has filed for compassionate release two other times. (*See* ECF Nos. 16, 32.) The Honorable Peter G. Sheridan, U.S.D.J. (ret.) denied both motions. (*See* ECF Nos. 24, 41.)

Mr. Manna filed the present Motion on August 26, 2024. (*See* ECF No. 63.) The Government opposed the Motion on September 20, 2024. (ECF No. 66.) A week later, Mr. Manna filed a supplemental brief with additional medical records. (ECF No. 67.) The Court held conferences with the parties on November 13, 2024 and December 9, 2024 to discuss Mr. Manna's health and the proposed plan for his release in the event the Court were to grant the Motion. (*See* ECF Nos. 69–70.) Thereafter, the Court received additional correspondence and medical updates from the defense and the U.S. Probation Office. The Court then heard oral argument in open court, which included sworn testimony by the Court-approved custodians of Mr. Manna upon release, on April 14, 2025.[4] (ECF No. 74.)

## II. <u>LEGAL STANDARD</u>[5]

Once a federally imposed sentence commences, a district court has limited authority to modify that sentence. *Dillon v. United States*, 560 U.S. 817, 824 (2010). However, 18 U.S.C. § 3582(c)(1)(A) allows a criminal defendant to seek a reduction in sentence if certain parameters are met. *See* 18 U.S.C. § 3582(c)(1)(A). Before a defendant can bring a motion for reduced sentence on their own behalf directly with the district court, a defendant "must at least ask the Bureau of Prisons ('BOP') to do so on their behalf and give BOP thirty days to respond." *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020) (discussing the exhaustion requirement). After this, a court may reduce an inmate's sentence if it finds that there are "extraordinary and

---

[4] Following oral argument, on April 15–16, 2025, the Court conducted teleconferences (placed under seal) with the parties and the U.S. Probation Office regarding the Court-approved custodians. The Court placed a number of court exhibits involving same on the record also under seal.

[5] Mr. Manna seeks compassionate release under two alternative bases: 18 U.S.C. § 3582(c)(1)(A)(i) and 18 U.S.C. § 3582(c)(1)(A)(ii). (*See* Mot. Br.) Because the Court finds Mr. Manna meets the requirements for compassionate release under § 3582(c)(1)(A)(i), it does not address Mr. Manna's arguments under 18 U.S.C. § 3582(c)(1)(A)(ii). The Court only observes that it is unlikely Mr. Manna qualifies under § 3582(c)(1)(A)(ii) because he was not sentenced under 18 U.S.C. § 3559(c), the "three strike" provision. *See United States v. Cole*, No. 23-3105, 2024 WL 1281126, at *2 (3d Cir. Mar. 26, 2024).

compelling reasons" that warrant a reduction, and it considers the sentencing factors set forth in 18 U.S.C. § 3553(a), as applicable. *United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The reduction must also be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Overall, "[c]ompassionate release is discretionary, not mandatory; therefore, even if a defendant is eligible for it, a district court may deny compassionate release upon determining that a sentence reduction would be inconsistent with the § 3553(a) factors." *United States v. Alexander*, No. 23-1011, 2023 WL 4198042, at *1 (3d Cir. June 27, 2023); *see also Pawlowski*, 967 F.3d at 329–30.

### III.  DISCUSSION

The crux of the dispute before the Court is whether Mr. Manna's compassionate release is consistent with the § 3553(a) factors. The Government conceded on the record both that Mr. Manna has met the exhaustion requirements of § 3582(c)(1)(A) and that Mr. Manna's severe health issues are "extraordinary and compelling reasons" that render Mr. Manna eligible for a reduction of his sentence. (OTR Stip. at 8:01–13; Opp. Br. at 15–17.) Nonetheless, the Court addresses these aspects of the Motion briefly as they weigh upon the § 3553(a) analysis.

#### A. EXHAUSTION REQUIREMENT

Mr. Manna submitted a request for early release to the Warden of FMC Rochester on July 10, 2024. (Opp. Br. at Ex. D.) Notably, the Warden acknowledged Mr. Manna was eligible for early release on August 5, 2024. (Opp. Br. at Ex. E.) The Government represents that the request went to the BOP's Central Office for approval, but it was ultimately procedurally returned to FMC Rochester for resubmission. The reasons for resubmission are not apparent from the record. (Opp. Br. at 10–11.) "BOP is unable to provide any estimate as to when it will be finally decided and cannot make any representation as to what the ultimate outcome will be." (*Id.* at 11.) Mr. Manna allowed over 30 days to lapse prior to filing his Motion on August 26, 2024. (ECF No. 63.) As the

Government acknowledged in writing and on the record, he thus adequately exhausted his administrative remedies pursuant to § 3582(c)(1)(A).

### B. EXTRAORDINARY AND COMPELLING REASONS FOR REDUCTION OF SENTENCE

The Government acknowledged that Mr. Manna's health deterioration "establish[es] extraordinary and compelling reasons making him eligible for relief under § 3582(c)(1)(A)." (Opp. Br. at 16.) Section 1B1.13(b)(1)(A) of the Sentencing Commission's Policy Statement reads:

> (b) Extraordinary and Compelling Reasons.—Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
>
> (1) Medical Circumstances of the Defendant.—
>
> (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (B) The defendant is—
>
> (i) suffering from a serious physical or medical condition,
>
> (ii) suffering from a serious functional or cognitive impairment, or
>
> (iii) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(A)–(B) (2024).

It is undisputed that Mr. Manna is of advanced age and gravely ill. He was transferred to FMC Rochester in 2020 because of his declining health. (ECF No. 67-1 at 2 (noting the transfer was "due to progressive debility related to back pain and his inability to perform his instrumental activities of daily living in a main institution").) FMC Rochester noted that Mr. Manna noticeably deteriorated within the last two years. (*Id.*) He was hospitalized in the summer of 2023 for cellulitis in his lower left leg. (*Id.*) He fell and was sent to the hospital in January 2024 (*id.*), and he was

also hospitalized for four weeks after testing positive for MRSA "likely due to entry through inflamed eczematous dermatitis on his hands." (*Id.*)

His health problems compounded after he was diagnosed with Stage II adenocarcinoma lung cancer around the same time as his January 2024 fall. (*Id.* at 3; *see* OTR Stip. at 8:14–23 (parties acknowledging the lung cancer was labeled "high-risk").) Following surgery on July 23, 2024 for cancer, Mr. Manna developed a collapsed lung which required the placement of a left pigtail catheter. (ECF No. 67-1 at 3 (noting the catheter was later removed).) He also developed "an episode of atrial fibrillation with rapid ventricular response" and post-operative pneumonia. (*Id.* at 3–4.) After he returned to FMC Rochester post-surgery, he noticed difficulty in moving both his left hand and left leg—he had had a stroke. (*Id.*) Mr. Manna was ultimately placed in a "Fall Watch" room in an inpatient 24-hour nursing care unit at FMC Rochester. (*Id.* at 5.) As FMC Rochester summarized in September 2024:

> Prior to his stroke, the patient suffered from a multifactorial gait disorder related to his Parkinson's disease, lumbar stenosis with neuroclaudication, length-dependent sensory and motor axonal peripheral neuropathy, right foot drop and poor vision. Adding to all this his recent stroke and accumulating medical conditions, it is highly unlikely that this patient will be able to function in an outpatient setting again, even on our Wheelchair Pusher Program. Additionally although his stroke was recent, it is not expected that he will make progress that would affect his activity levels significantly, particularly with our limited physical therapy resources.

(*Id.* (stating Mr. Manna "does qualify for consideration of a reduction in sentence from a medical standpoint").) The parties stipulated that more recent medical records also indicate Mr. Manna has recurring MRSA and chronic kidney disease, among other health issues.[6] (OTR Stip. at 9:03–06.)

---

[6] FMC Rochester's Medical Summary dated September 4, 2024 lists forty patient diagnoses: "1. Cerebrovascular accident (CVA) August 3, 2024 with left-sided weakness due to right parietal infarct and smaller left parietal infarction; 2. Mild-moderate aortic stenosis, asymptomatic; 3. Paroxysmal atrial fibrillation July 30, 2024 postoperatively with history of frequent supraventricular ectopy with supraventricular tachycardia; 4. Hypertension; 5. Coronary artery disease (CAD), asymptomatic; 6. Chronic, stable elevations of Troponin T likely due to chronic kidney disease; 7. Peripheral vascular

9

Mr. Manna's well-chronicled severe health problems undoubtedly establish "extraordinary and compelling reasons" for compassionate release. His high-risk Stage II metastatic lung cancer—which medical reports from March 2025 indicate could be spreading throughout his lungs—alone qualifies as "extraordinary and compelling" under U.S.S.G. § 1B1.13(b)(1)(A). (*See* OTR Stip. at 43:2–6.) Moreover, Mr. Manna's deteriorating health has substantially diminished his ability to care for himself. Medical records provided by defense counsel indicate Mr. Manna needs "assistance with toileting . . . shower transfers . . . medication set up/administration[7] . . . showering/bathing . . . dressing . . . cognitive assistance needed . . . physical assistance needed" and that he cannot "maintain an acceptable level of cleanliness without assistance" and requires assistance "with food preparation." (*See, e.g.*, ECF No. 67-1 at 5.) Thus, Mr. Manna has more than sufficiently established "extraordinary and compelling reasons" rendering him eligible for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

---

disease; 8. Hyperlipidemia; 9. Possible meningioma; 10. Prediabetes; 11. Chronic kidney disease, stage 3b-4; 12. Adenocarcinoma left lower lung; status post July 23, 2024 robotic assisted thoracoscopy with left lower lobectomy and mediastinal lymphadenectomy . . . Two of seven intrapulmonary peribronchial lymph nodes were involved by metastatic adenocarcinoma; 13. Indeterminate pulmonary nodule right middle lobe; 14. Postoperative left lung pneumonia August 3, 2024; 15. Left thyroid nodule with negative fine needle aspirate on May 15, 2024; 16. History of cecum carcinoma 1995; status post partial colectomy and chemotherapy); 17. Duodenal tubular adenoma September 1, 2016; 18. Gastroesophageal reflux disease (GERO); 19.Asymptomatic right inguinal hernia; 20. Trans urethral resection of the prostate (TURP) 1977; 21. Prostate cancer (Gleason score 2+2) 1995 s/p radical prostatectomy; 22. History of kidney stones; 23. Gross hematuria 2022 with negative urine cytology, CT Urogram and cystoscopy; 24. Normocytic normochromic anemia; 25. Parkinson's disease (PD); 26. Chronic cervical radiculopathy with cervical spondylosis; 27. Lumbar stenosis with neuroclaudication; 28. Length-dependent sensory and motor axon al peripheral neuropathy by electromyogram (EMG) on April 19, 2021; 29. Right foot drop treated with ankle foot orthotic (AFO); 30. Multifactorial gait disorder due to above; 31. Right carpal tunnel syndrome by EMG on April 19, 2021; 32. Chronic eczema; 33. Cellulitis left lower leg requiring hospitalization June 30, 2023; 34. Methicillin resistant Staphylococcus aureus (MRSA) bacteremia on January 30, 2024, with history of recurrent MRSA skin infections; 35. Onychomycosis; 36. Herpes zoster V2 distribution February 5, 2024; 37. Bilateral sensorineural hearing loss; 38. Latent tuberculosis infection (LTBI) July 26, 1988; declined therapy; 39. Bilateral cataracts; status post phacoemulsification with intraocular lens implantation left eye on May 8, 2024. Advanced right cataract remains; 40. Geographic atrophy both eyes."
(ECF No. 67-1 at 1–2.)

[7] As of January 14, 2025, medical records provided by defense counsel indicate Mr. Manna was on sixteen active medications including apixaban, atorvastatin, lisinopril, and metoprolol.

C. SECTION 3553(A) FACTORS

Even having found that Mr. Manna has established "extraordinary and compelling reasons," the Court still must consider whether the applicable § 3553(a) factors warrant the same. *See United States v. Moe*, 543 F. Supp. 3d 63, 66 (D.N.J. 2021). The factors to be considered under § 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> [. . .]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a).

The Government argues that "[d]ue to the nature and circumstances of Manna's offense — RICO conspiracy to commit murder — release would not be consistent with the relevant sentencing factors set forth in 18 U.S.C. § 3553(a)." (Opp. Br. at 2.) The Government also argues Mr. Manna's early release would not reflect the seriousness of his conduct, promote respect for the law, or provide just punishment. (*Id.* at 19–21.) For his part, Mr. Manna argues that he has exhibited "extraordinary rehabilitation" over his 36 years of incarceration and poses a low risk of recidivism. (Mot. Br. at 11–13.) He argues that his lengthy sentence has already satisfied the common core goals of the criminal justice system of "retribution, deterrence, incapacitation, and

rehabilitation," and that his sentence "far exceed[s] the median sentence for other defendant's [sic] convicted of graver offenses." (*Id.* at 17.)

The Court addresses the applicable § 3553(a) factors in turn.

1. <u>Nature and Circumstances of the Offense and History and Characteristics of the Defendant</u>

To state it plainly, the nature and circumstances of Mr. Manna's criminal conduct, including convictions of conspiracy to murder Irwin Schiff, John Gotti, and Gene Gotti were reprehensible, and his role in orchestrating the public murder of Mr. Schiff in a New York City restaurant evidenced particularly brazen depravity. Mr. Manna's history of crime is not limited to these discrete conspiracies—he worked in the highest ranks of organized crime in the United States as a Consigliere for the Genovese Crime Family as early as 1980. (PSR ¶¶ 2, 27, 182.) The PSR's calculated offense level for Mr. Manna at a 47 was quite literally off-the-charts—the 1988 U.S. Sentencing Guidelines only contemplated offense levels up to a level of 43. (OTR Stip. at 6:23–7:12); *see* U.S.S.G. Ch. 5, Part A (1988) (stating an offense level of 43 mandated a life sentence). Indeed, consideration of § 3553(a)(1) twice led another federal judge to reject Mr. Manna's prior motions for compassionate release. (ECF No. 24 at 11; ECF No. 41 at 4.)

Notwithstanding, the Court observes that the "most up-to-date picture" of Mr. Manna is vastly different than that of the violent mobster of 36 years ago. *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (finding "evidence of [defendant's] rehabilitation since his initial sentencing . . . clearly relevant" to the inquiry into defendant's "history and characteristics"). Mr. Manna is currently 95 years old, significantly deteriorated, and sickly. (ECF No. 67-1 at 2.) His most severe illness, high-risk Stage II lung cancer, was only diagnosed in 2024—years after his last motion for compassionate release was denied in 2021. (*See* ECF No. 41.) Unsurprisingly, the BOP has found Mr. Manna to have a "low" risk of recidivism. (ECF No. 64-2 at 2.) While incarcerated, the parties

stipulated he has also had a clean disciplinary record. (OTR Stip. at 9:15–25.) The Court notes FMC Rochester's Warden acknowledged Mr. Manna is eligible for early release. (Opp. Br. at Ex. E.)

Even though Mr. Manna faced dying in prison, he did not give up on bettering himself while incarcerated. He has earned over 2,017 days in Earned First Step Act Time Credits. (Mot. Br. at 12; ECF No. 64-5.) The Court received letters from Mr. Manna's stepson, daughter, and granddaughters who wrote of the support and love Mr. Manna has provided them even while incarcerated. (ECF No. 64-4.) A staff member at FMC Rochester described Mr. Manna as "very pleasant." (ECF No. 67-1 at 2.)

Mr. Manna's circumstances are not unlike those in *United States v. Tidwell*, 476 F. Supp. 3d 66 (E.D. Pa. 2020). There, the Eastern District of Pennsylvania considered a motion for compassionate release filed by an inmate with metastatic prostate cancer. *Id.* at 68. The inmate, who was sentenced in 1997, was serving life imprisonment on murder, drug, firearm, and criminal enterprise charges. *Id.* The court found that consideration of § 3553(a)(1) "tilt[ed] in favor of reducing [defendant's] sentence" because he had taken a significant number of educational courses while incarcerated, had a "minimal, non-violent disciplinary record," had positive reviews from correctional center staff, and had a low risk of recidivism. *Id.* at 77. These same factors are present with Mr. Manna: (i) he has attended a significant amount of educational programming while incarcerated; (ii) he has no disciplinary record; (iii) at least one staff member at FMC Rochester has referred to him as "very pleasant," and (iv) he has a low risk of recidivism.

To be clear and as stated repeatedly herein, the Court finds Mr. Manna's conduct decades ago to be nothing short of depraved. However, unlike at the time of Mr. Manna's prior motions for compassionate release, he now has been diagnosed with serious metastatic lung cancer and is

suffering from its associated complications, including a stroke. Given his significantly advanced age, failing health, and the substantial amount of time—36 years—that he has deservedly spent incarcerated for his egregious criminal conduct, the Court finds consideration of § 3553(a)(1) now tips ever-so-slightly in favor of Mr. Manna's early release.

### 2. Seriousness of the Offense, the Promotion of Respect for the Law, and Just Punishment

The Court again is cognizant that Mr. Manna's offenses, which include conspiracy to commit murder, sit at the lowest depths of criminal conduct. As the Government argues, RICO was explicitly designed to enhance the penalties for those engaging in the "pervasive[]" problem of organized crime. (Opp. Br. at 19 (quoting *United States v. Turkette*, 452 U.S. 576, 588–89 (1981)).) Mr. Manna, who was 60 years old at the time of his sentencing, was sentenced to 80-years imprisonment for a reason; indeed, it is reasonable to conclude that the intention was for him to die in prison. It is also the case, however, that Mr. Manna has spent serious time incarcerated—36 years. At the age of 95 he has lived significantly longer than the average male life expectancy, meaning he has also spent more time incarcerated than reasonably expected. In fact, as the average life expectancy for males in the United States is 74.8 years, Mr. Manna has exceeded the average life expectancy by more than two decades. *See Life Expectancy*, CDC National Center for Health Statistics, https://www.cdc.gov/nchs/fastats/life-expectancy.htm (last visited April 15, 2025). Mr. Manna has even outlived any known family of the murder victim in this case, Mr. Schiff. (OTR Stip. at 7:13–24.) His multi-decades-long incarceration period—the last many years of which he has spent suffering and in declining health—undoubtedly promotes respect for the law and the severe consequences for convictions under RICO.

The Court finds that the seriousness of Mr. Manna's offenses and the necessity that he be subject to just punishment will be reflected through the utmost stringent conditions of release in

14

conjunction with his already-served decades in prison. To be sure, upon release, Mr. Manna will not be given free range to do as he pleases and leave behind the consequences of his crimes. As set forth in the accompanying Order, Mr. Manna will be subject to the maximum of five years of supervised release. He will be under vigilant oversight by the United States Probation Office, including 24-hour house arrest with GPS monitoring, the cost of which will be borne by Mr. Manna's custodians. Mr. Manna will be under the supervision of his Court-approved custodians 24 hours a day. He will be precluded from communicating with any person other than his custodians unless the person is pre-approved and authorized to communicate with Mr. Manna by the U.S. Probation Office—and he is prohibited from communicating, in any form, with anyone else. He is ordered to have no contact with any current or former members of organized crime. At the April 14, 2025 hearing, the Court-approved custodians appeared and testified under the penalty of perjury that they would ensure this Court's orders were followed by Mr. Manna through their 24-hour supervision of him. (ECF No. 74.) Any non-compliance by either Mr. Manna or his custodians will be viewed as disobeying a Court order, the consequences of which will be revocation of Mr. Manna's supervised release and his immediate return to federal prison.

The Court is satisfied that these conditions, which essentially render Mr. Manna a dying prisoner in his custodians' home, reflect the seriousness of Mr. Manna's crimes and are just punishment for a man at the very last stage of life who has spent the last 36 years incarcerated. His sentence to date "has consumed a large part of his life and by any measure represents a very substantial punishment." *United States v. Redd,* 444 F. Supp. 3d 717, 727 (E.D. Va. 2020) (finding twenty-three years incarcerated was "a period of time that promotes respect for the law and provides just punishment"); *see United States v. Wong Chi Fai*, No. 93-1340, 2019 WL 3428504, at *4 (E.D.N.Y. July 30, 2019) (granting compassionate release where in part defendant had

15

"already served 26 years of his life sentence, the last three of which ha[d] been spent in medical purgatory"); *United States v. Gluzman*, No. 96-323, 2020 WL 4233049, at *19 (S.D.N.Y. July 23, 2020) (granting compassionate release and observing, in part, that 24 years imprisonment for murder is "a lengthy period of time" that "reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense").

With stringent conditions of release in place, consideration of § 3553(a)(2)(A) leans in favor of a reduction of Mr. Manna's sentence.

3. Adequate Deterrence and Protection of the Public

The Government "concedes that specific deterrence and protection of the public from [Mr. Manna] are likely not at issue." (Opp. Br. at 21.) The Court agrees. Mr. Manna is 95 years old and gravely ill. He has a substantially diminished ability to care for himself. Mr. Manna's sentence, which he has served "while seriously ill . . . has been significantly more laborious than that served by most inmates." *United States v. McGraw*, No. 02-18, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019). Specific deterrence has certainly been satisfied; even assuming Mr. Manna is "theoretically capable of engaging in illegal conduct"—which, given his age and medical deterioration, seems impossible—to deny Mr. Manna's Motion on this ground "would vitiate Congress's clear intent to allow terminally ill inmates to obtain compassionate release." *Tidwell*, 476 F. Supp. 3d at 78.

In Mr. Manna's 36 years incarcerated, he has not had a *single* disciplinary infraction. (OTR Stip. at 9:15–25.) The BOP has found him to have a "low" risk of recidivism. (ECF No. 64-2 at 2.) Indeed, "as age increases recidivism by any measure decline[s]." U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 30 (Dec. 2017) ("Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average."). Mr. Manna's age and deteriorating health ensure there is little

16

risk of danger to the public upon his supervised release. *United States v. Bellamy*, No. 15-1658, 2019 WL 3340699, at *6 (D. Minn. July 25, 2019) (explaining "[a]ny limited risk can be mitigated by supervision"). The Court is satisfied the considerations behind § 3553(a)(2)(B)–(C) will not be vitiated by Mr. Manna's compassionate release.

   4. Avoiding Sentencing Disparities

The parties each make much of Mr. Manna's imposed sentence as compared to other similarly-situated defendants. (*See* Mot. Br. at 17–21; Opp. Br. at 21–25.) The Government notes that in the period of 2019 through 2023, 416 defendants were sentenced at a criminal history category I (like Mr. Manna) for murder-related offenses under U.S.S.G. § 2A1.1. (Opp Br. at 24.) Of those defendants, 18.5% received life sentences and another 18.5% received sentences between 30 years to life. (*Id.*) The Court does not find Mr. Manna's initial sentence of life imprisonment to be disparate, nor does it find that reducing Mr. Manna's term of imprisonment after he has already served 36 years would result in a disparity. Section 3553(a)(6) does not tip the scales one way or the other with respect to Mr. Manna's compassionate release.

   5. Remaining § 3553(a) Factors

The parties do not argue—and the Court does not find—that consideration of any of the remaining § 3553(a) factors counsel against Mr. Manna's compassionate release. With respect to the "kinds of sentences available" under § 3553(a)(3), "incarceration [] is not the only 'kind[ ] of sentence available." *United States v. Brown*, 457 F. Supp. 3d 691, 704 (S.D. Iowa 2020). Even taking the Government's point that the Sentencing Guidelines prescribe life imprisonment for Mr. Manna's offense level (47), the Guidelines "are but one factor." *United States v. Parker*, 461 F. Supp. 3d 966, 984 (C.D. Cal. 2020) (citation omitted); *see* 18 U.S.C. § 3553(a)(4).

This matter has always turned on the nature and seriousness of Mr. Manna's crimes as compared to his present circumstances. Unlike when Mr. Manna brought his prior motions for

compassionate release—which were denied by a federal judge—Mr. Manna's deterioration has now reached a clear point of no return. Within the first year of being diagnosed with Stage II lung cancer, Mr. Manna suffered a collapsed lung, post-operative pneumonia, and a stroke. At his advanced age, FMC Rochester acknowledged he was eligible for early release and that it was "highly unlikely" he would be able to ever function in an outpatient setting again or increase his activity levels. (Opp Br. at Ex. E; ECF No. 67-1 at 5.) All parties agree his deterioration is an "extraordinary and compelling reason" rendering him eligible for compassionate release. While a close call given the seriousness of Mr. Manna's criminal conduct 36 years ago, the Court's consideration of the § 3553(a) factors in light of Mr. Manna's serious health issues counsels in favor of granting Mr. Manna compassionate release. Denying his Motion at this juncture in light of his grave illnesses would result in Mr. Manna serving out a sentence "greater than necessary." *See* 18 U.S.C. § 3553(a). The Court in its discretion **GRANTS** Mr. Manna's Motion.

## **CONCLUSION**

For the foregoing reasons, Mr. Manna's Motion is **GRANTED**. An appropriate Order **UNDER SEAL** detailing the conditions of Mr. Manna's supervised release will accompany this Opinion.

                                                                        _____
                                                                          **ROBERT KIRSCH**
                                                                          **UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: April 16, 2025